■ 305 EAST 24TH OWNERS CORP. et al., Appellants, v PARMAN Co. et al., Respondents. PARMAN Co. et al., Respondents, v ANTHONY S. NISKANEN et al., Appellants.—Order, Supreme Court, New York County (Harold Tompkins, J.), entered November 6, 1985, denying plaintiffs' motion for summary judgment and to dismiss the counterclaims in the answer, modified, on the law, to dismiss the counterclaims, and otherwise affirmed, without costs or disbursements.

The action was brought, *inter alia,* for breach of contract

and specific performance to direct defendants to transfer to 305 East 24th Owners Corp. the sum of $578,650, as the reserve fund required by Administrative Code of the City of New York § YYYY51-3.0, known as Local Law No. 70 of City of New York, adopted October 14, 1982, effective February 1, 1983. Local Law No. 70 directs the establishment of a reserve fund within 30 days after closing of a conversion from rental apartments to cooperative ownership, in an amount equal to 3% of the total offering price to tenants in occupancy. It provides that such fund is "to be used exclusively for making capital repairs, replacements and improvements necessary for the health and safety of the residents of such buildings" and, further, that such fund "shall be exclusive of any working capital fund and shall not be subject to reduction for closing apportionments." (Administrative Code § YYYY51-3.0 [a].) Local Law No. 70 was upheld by the Court of Appeals in *Council for Owner Occupied Hous. v Koch* (61 NY2d 942) approximately seven months prior to the closing in this case.

The offering plan to convert the premises at 305 East 24th Street, New York, New York, was accepted for filing by the Attorney-General on January 25, 1983. The original offering plan established a reserve fund of $772,000 (3% of the original total offering price to tenants in occupancy) and a working capital fund of $25,000, the latter to be used for ordinary expenses, maintenance or repairs. Subsequently, there were negotiations between the sponsor and the tenants, as a result of which the price per share was reduced to $56.37, which, as applied to the 342,174 shares allocated to the apartments to be sold, resulted in a proportionate reduction in the reserve fund to $578,650. The agreement, reflected in a letter dated August 12, 1983 from the tenant's attorney, Irving Sonnenschein, to the attorney representing the sponsor, provided that, at closing, a reserve fund of $600,000 would be paid, plus $1,000 per room for each apartment, as and when sold. The sponsor contends that the parties agreed to establish reserve and working capital funds in the total aggregate of $650,000, in addition to imposing a "flip-tax" of $4 per share to be paid by a tenant on a sale in the first year after closing, which amount was to be reduced in later years. This was contained in the first amendment to the offering plan, dated March 28, 1984, which was accepted for filing by the Attorney-General in April of that year.

The first amendment set forth the substance of what had been agreed upon in the negotiations, including, *inter alia,* a reduced price to tenant purchasers ($56.37), the transfer fee or

flip-tax, and a reduction in the required down payment from 10% to $1,000. While the first amendment did not expressly refer to the reserve fund, paragraph 4, entitled "Working Capital Fund", amended the original offering plan as follows: "The Apartment corporation's Working Capital Fund is hereby established at $650,000. It will be acquired by the Apartment Corporation and used and applied in the same manner as set forth in the Plan. i.e. for working capital, repairs and other appropriate corporate purposes. The said amount shall not be reduced as a result of closing adjustments in favor of the Seller. The Apartment Corporation shall, however, bear such adjustments, in an amount not to exceed One-Hundred Fifty Thousand Dollars ($150,000). In the event that the Apartment Corporation is obligated with respect to closing adjustments (not to exceed $150,000), such obligation will be evidenced by a noninterest bearing note of the Corporation in favor of the Seller or its designee which will be due and payable one year from the Closing Date."

The closing was held on October 25, 1984, when title was transferred to the sponsor and individual closings were held regarding 323 tenants. At the closing, $650,000 was transferred, purportedly in satisfaction of the reserve and working capital funds. It was at the closing that, for the first time, the tenants contended that the sponsor had not satisfied Local Law No. 70 by establishing a reserve fund. Nevertheless, the closing continued and was not adjourned because of this claimed deficiency.

This action was commenced less than three months later, the tenants claiming that the provision in the first amendment for a $650,000 working capital fund did not pertain to the separate reserve fund required by Local Law No. 70. The answer included an affirmative defense that the parties had intended the aggregate sum of $650,000 to include both the Local Law No. 70 reserve fund and the working capital fund; this was understood and agreed upon by both parties in their negotiations and was reflected in a letter by Sonnenschein prior to the closing; and there was an inadvertent error in drafting the first amendment in failing to state that the total amount was for both funds, especially since the parties had never discussed increasing the working capital fund from $25,000 to $650,000, allegedly an exorbitant, unusual and unnecessary increase. It appears that the first amendment was prepared almost entirely by Sonnenschein, who was not present at the closing when the claim was first advanced that

the document did not accurately reflect the intention and agreement of the parties.

After joinder of issue, plaintiffs moved for summary judgment, seeking relief directing the sponsor to establish a reserve fund of $578,650, on the basis that the first amendment increased the working capital fund but not the reserve fund, which allegedly was never created. They claimed that the first amendment was clear and unambiguous on its face and, therefore, parol evidence was inadmissible to vary the terms of the agreement.

Defendants opposed the motion, contending that the $650,-000 was a combined figure, to represent both the reserve and working capital funds, which amount is concededly sufficient for that purpose under the 3% requirement of Local Law No. 70. As support for their position, defendants first referred to a footnote in the plan which described the projected annual interest to be earned on both funds ($40,000) and then to an eighth amendment to the offering plan, filed subsequent to the closing, which specifically stated that the first amendment had provided for the retention by the Apartment Corporation of a reserve fund in the amount of $650,000. Thus, defendants argued that the first amendment's sole reference to a working capital fund was an inadvertent error, inconsistent with the express intention of the parties, and as agreed to by the tenants' counsel, Sonnenschein, in his preclosing letter to the sponsor's attorney. Therefore, equitable estoppel should apply to prevent an unwarranted windfall to the tenants. It was claimed that since all of the parties knew that $650,000 had been segregated for both funds, the tenants, through counsel, had proceeded in bad faith by interjecting the issue for the first time at closing to coerce the sponsors to agree to a further price reduction.

Special Term denied summary judgment, concluding that there were material questions of fact relating to the nature and purpose of the establishment of the $650,000 fund(s) which could not be determined upon the conflicting proof presented. It held that further exploration of the facts as to the negotiations by the parties and their intent was necessary.

We agree that, on this record, there are factual issues which may not be summarily resolved. A trial is necessary, especially taking into account the limited function of the court on a motion for summary judgment as issue finding, not issue determination *(Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404). The drastic relief of summary judgment should not be granted where there is any doubt as to the

existence of a triable issue *(Moskowitz v Garlock,* 23 AD2d 943, 944), or where the issue is arguable *(Barrett v Jacobs,* 255 NY 520, 522).

We find the record replete with factual issues relating to the negotiations between the parties, their intent in segregating $650,000, and whether that amount was to represent the working capital fund only or whether it also included the reserve fund. Concededly, $650,000 was more than sufficient to satisfy both funds, and it is claimed that the parties and their counsel knew the sum was to cover both. In substance, Sonnenschein stated this in his letter to the sponsor's attorney in August 1983, seven months before the first amendment to the offering plan. That letter, which expressly refers to a "reserve fund of $600,000 to be paid at closing plus $1000 per room for each apartment as and when sold", is hardly "equivocal", as is suggested by our dissenting colleague.

While the first amendment does not expressly refer to a reserve fund and, on its face, purports to segregate only the working capital fund, it is undisputed that $650,000 is greatly in excess of what would be normally required for a working capital fund, which is for ordinary repairs and corporate uses, and is entirely different from a reserve fund, which covers the cost of capital replacements and other similar major expenses. In considering the issue, we must be mindful of the practical aspects of these cooperative conversions and the unrefuted claim that a working capital fund of $650,000 would be unnecessary, extraordinary and "simply unheard of."

Further reflecting the claim that the parties intended the $650,000 to constitute both funds is the inclusion of a footnote in the first amendment, projecting anticipated future annual income of $40,000 as annual interest from the working capital and reserve funds to be retained by the Apartment Corporation. In addition, the eighth amendment, although subsequent to the closing, refers to the first amendment as having provided for the retention of $650,000 as a reserve and working capital fund.

These are factors to be considered at trial in determining whether the first amendment accurately reflects the true agreement of the parties or whether there was an inadvertent error in failing to refer to the $650,000 as constituting both funds. The issue cannot be determined on this conflicting record.

Our dissenting colleague concludes that there is no ambiguity in the first amendment and that parol evidence may not be

considered to vary or alter its clear and unambiguous terms. In our view, this ignores the unrefuted claim by the sponsors that the first amendment was "composed almost entirely by Sonnenschein himself", suggesting that there was some impropriety in the reference to the $650,000 as representing only the working capital fund, when it is contended the parties had agreed otherwise.

This is especially so where, as here, the motion for summary judgment has abruptly halted defendants' discovery and the opportunity to depose Sonnenschein. Moreover, and in further support of the inadequacy of discovery, is the fact that, although Sonnenschein did submit a reply affidavit, he did not refute the charge that he prepared an amendment which did not accurately reflect the parties' understanding.

We recognize that, ordinarily, the interpretation of a contract poses a question of law for the court, but where the agreement is ambiguous in light of the history of the negotiations, especially where it flies in the face of usual business customs, or where the language is equivocal and its interpretation depends upon the context in which the words were employed in relation to the subject matter and the surrounding circumstances, the issue is a mixed question of law and fact. This requires a trial, at which extrinsic evidence may be considered. (Kenyon v Knights Templar & Masonic Mut. Aid Assn., 122 NY 247, 254; Lachs v Fidelity & Cas. Co., 306 NY 357, 364; Steckler v Steckler, 78 AD2d 818.) The dissent's position that the offering plan is unambiguous and, therefore, its interpretation presents solely a question of law, overlooks the absence of any explanation in the record as to the reason for the extraordinary, 25-fold increase in the working capital fund from $25,000 to $650,000.

Under the facts of this case, application of the parol evidence rule does not, as claimed by plaintiffs, require that summary judgment be granted. While parol evidence is not admissible to contradict or vary a written agreement, it does not preclude introduction of proof to negate the existence of a binding contract or to demonstrate that there was fraud or mistake (see generally, 22 NY Jur, Evidence, § 631; 21 NY Jur 2d, Contracts, § 121). As applied here, it is alleged that the omission in the first amendment of the understanding that the $650,000 represented both the reserve and the working capital funds was a mutual mistake, inconsistent with what had actually been agreed upon. Clearly, this relates to a substantial matter.

Moreover, the third affirmative defense, based upon mutual

mistake, and the fourth affirmative defense, alleging estoppel, essentially seek equitable relief in the nature of reformation. The third defense alleges that the parties had agreed to the sum of $650,000 for both the reserve and working capital funds and that there was a mutual mistake in the first amendment since "it was never contemplated, intended or agreed between the parties that the Working Capital Fund be increased from the $25,000 figure set forth in the original Plan to the sum of $650,000." It is a familiar principle of law that a court will exercise its equity jurisdiction to correct an error where, through mistake, an agreement does not conform to what the parties had intended or where there was fraud or inequitable conduct and mistake by one party. (6 NY Jur, Cancellation and Reformation of Instruments, § 40, at 585: "Undoubtedly, where the parties to a contract have arrived at an agreement and where a mistake is made in reducing the agreement to writing, so that the terms of the written paper are at variance with the terms of the agreement, the court of equity will reform the writing the express the true agreement between the parties.")

However, we disagree with so much of the determination at Special Term which denied plaintiffs' motion for summary judgment dismissing the counterclaims, the first for abuse of process and the second and third based upon corporate waste and mismanagement. The tort of abuse of process has three elements: (1) regularly issued process, either civil or criminal, (2) an intent to harm without excuse or justification, and (3) the use of process in a perverted manner to obtain a collateral object (*Curiano v Suozzi,* 63 NY2d 113, 116; *Board of Educ. v Farmingdale Classroom Teachers Assn.,* 38 NY2d 397, 403; *Dean v Kochendorfer,* 237 NY 384, 390). These and other cases have held that the essence of the tort is the improper use of process after it is issued, not the malicious issuance of process. In addition, to sustain a cause of action for abuse of process, there must be injury to or interference with one's person or property under color of process (*Williams v Williams,* 23 NY2d 592, 596). Inasmuch as here, the only process issued was a summons and complaint, necessary to commence the action and obtain jurisdiction, "there was no unlawful interference with [defendants'] persons or property because the institution of a civil action by summons and complaint is not legally considered process capable of being abused [citations omitted]" (*Curiano v Suozzi, supra,* at p 116). Thus, the first counterclaim is legally insufficient.

Similarly deficient are the second and third counterclaims

for corporate waste and mismanagement. While it is alleged that the action amounts to a waste of corporate assets, since the suit seeks to increase the reserve fund, which can only benefit the Apartment Corporation, we fail to perceive in what manner the corporation will be prejudiced should plaintiffs ultimately be successful. Moreover, defendants, consisting of the sponsor, the nominee and assignee of the sponsor's unsold shares, do not appear to be the proper party shareholders, authorized to bring a derivative claim based upon corporate mismanagement and waste. In addition, the action was authorized by an executive committee, duly appointed by the board of directors, which, on January 4, 1985, had voted to ratify all interim actions and resolutions of the executive committee. Concur—Sullivan, Carro, Milonas and Kassal, JJ.

Murphy, P. J., dissents in part in the following memorandum: On October 25, 1984, over 300 tenants of 305 East 24th Street participated, as purchasers of the shares assigned to their apartments, in a closing during which title to their building was transferred from defendant sponsor, Parman Company, to plaintiff 305 East 24th Street Owners Corporation. The purchasing tenants in this cooperative conversion had earlier executed subscription agreements which provided:

"13. The entire agreement between the parties hereto is set forth herein and in the documents made a part hereof. The only representations made to me are those contained herein and in the Plan. No person has been authorized to make any representation or warranty not set forth in the Plan. I have not relied upon any representations, statements or warranties, written or oral, as to any matter or estimate that are not set forth herein or in the Plan, and I acknowledge that I have had full opportunity to examine all documents and investigate all facts referred to and stated herein. This Agreement is not assignable by me without the prior written consent of the Apartment Corporation and shall bind and apply to the parties hereto and their personal and legal representatives, successors and assigns and may not be changed orally.

"14. Conflicts between this agreement and the Plan shall be resolved in favor of the Plan."

The cooperative conversion offering plan referred to, covering each of the 386 apartments in the subject building, was accepted for filing by the Attorney-General in January 1983. Shortly afterwards it was distributed to the building's tenants. Prominently placed on the cover page of the plan is a computation of the maximum net purchase price of the property to the apartment corporation, which computation is replicated

on page 106 of the offering. As is relevant here, the computation indicates with crystal clarity that the total purchase price is to be reduced twice; first to allow the apartment corporation to retain a reserve fund of some $772,250 and, second to allow it to retain a working capital fund of some $25,000. Immediately before and after this computation are directions in bold typeface referring the reader to the "Special Risks" section on the first page of the offering. There it is explained that the $772,250 Reserve Fund is provided pursuant to Local Law No. 70 of City of New York and that this amount is subject to reduction if the local law is found unconstitutional. (The local law was subsequently upheld by the Court of Appeals in *Council for Owner Occupied Hous. v Koch,* 61 NY2d 942.)

Section T of the offering is headed in bold letters "RESERVE FUND AND WORKING CAPITAL FUND." Subsection 1 refers to the working capital fund alone and is headed accordingly. It is there noted that the working capital fund "may be held for working capital and for repairs *and other appropriate corporate purposes as determined by the Board of Directors.*" (Emphasis added.) Subsection 2 is headed "Reserve Fund" and reiterates that a reserve fund of some $772,000 will be provided the Apartment Corporation if the applicable local law is found constitutional.

At the end of the offering are found the sponsor's certifications wherein the sponsor's principals uniformly aver under penalty of perjury, *inter alia,* that "the Offering Plan does, and that all documents submitted hereafter which amend or supplement the offering plan: a) sets forth the detailed terms of the transactions *and is complete current and accurate;* b) affords potential investors, purchasers and participants an adequate basis on which to found their judgment; c) does not omit any material fact" (emphasis added).

That the offering is meant to be complete is more prominently asserted at the foot of the cover page where the reader is informed in bold-faced capitals, "THIS OFFERING PLAN IS THE SPONSORS ENTIRE OFFER TO SELL THESE COOPERATIVE APARTMENTS." Indeed, the offering plan had to be the sponsor's entire offer since the Martin Act (General Business Law § 352-e [1] [b]; [5]) commands that "No offering or sale whatever * * * shall be made except on the basis of information, statements, literature, or representations constituting the offering statement".

The first amendment to the offering plan is dated March 28, 1984 and is, as it instructs, to be read in conjunction with said

plan. Item number 4 of the amendment is titled "Working Capital Fund" in bold, underscored type. It provides in its entirety: "The Apartment Corporations' Working Capital Fund is hereby established at $650,000. It will be acquired by the Apartment Corporation and used and applied in the same manner as set forth in the Plan i.e. for working capital, repairs and other appropriate corporate purposes. The said amount shall not be reduced as a result of closing adjustments in favor of the Seller. The Apartment Corporation shall, however, bear such adjustments, in an amount not to exceed One-Hundred Fifty Thousand Dollars ($150,000). In the event that the Apartment Corporation is obligated with respect to closing adjustments (not to exceed $150,000), such obligation will be evidenced by a non-interest bearing note of the Corporation in favor of the Seller or its designee which will be due and payable one year from the Closing Date."

There are no other provisions in the first amendment affecting the reserve or working capital funds referred to in the preamendment version of the plan. It should be noted in particular that not one of the 26 items listed in the amendment's enumeration of updates and corrections to the plan (first Amendment item number 19) in any way alters or even refers to the reserve fund provisions contained in the preamendment offering. Item 20 to the first amendment states "Except as set forth in this First Amendment, there have been no other material changes in the Plan."

Six more amendments to the plan were filed in the half year intervening between the first amendment and the closing. None of these amendments bears even remotely upon either the reserve fund or the working capital fund.

At the closing, defendant sponsor tendered plaintiff Apartment Corporation two checks: one for $515,597.83 and a second for $134,402.17. The second check was escrowed as security for the Apartment Corporation's payment of the one-year note given by it for closing adjustments in the seller's price. Plaintiff protested that the $650,000 sum represented by the two checks satisfied the sponsor's obligation as to the working capital fund only, and demanded payment of a separate reserve fund, computed on the basis of the actual purchase price as amounting to $578,650. Defendant refused this demand, maintaining, as it continues to do, that the $650,000 tendered covered both the reserve fund and the working capital fund. Despite the parties' differences the closing was concluded. The present action was thereafter initiated by the Apartment Corporation to obtain the reserve fund allegedly

denied it by defendant. Defendant answered, alleging that the first amendment to the offering plan reflected the parties' agreement that the reserve and working capital funds would be referred to in the aggregate as the working capital fund and would together amount to $650,000. Defendant also counterclaimed alleging that plaintiff's suit was instituted for the sole purpose of "extorting" additional funds from defendant and so constituted an abuse of process. Two additional counterclaims were asserted, alleging derivatively on the Apartment Corporation's behalf that plaintiff's action was unauthorized and wasteful of corporate assets.

Plaintiff moved for summary judgment and for the dismissal of defendant's counterclaims, which motion was denied by Special Term in the order appealed from. While I am in agreement with the majority that defendant's counterclaims do not state causes of action and must, therefore, be dismissed, I find it necessary to part company with the majority as to its affirmance of the remainder of Special Term's order denying plaintiff's motion for summary judgment. It is my view that well-established principles of contract law and the clear mandate of Local Law No. 70 require that the present dispute be resolved as a matter of law in plaintiff's favor.

The construction of an unambiguous provision from a written contract is the province of the court. This is to say that where the parties have plainly expressed their intent in writing, the meaning of the writing is to be determined as a matter of law on the basis of the writing alone without resort to extrinsic evidence (*Chimart Assoc. v Paul,* 66 NY2d 570, 572; *Teitelbaum Holdings v Gold,* 48 NY2d 51, 56).

The terms of the contract with which we presently deal are wholly included in the offering plan of defendant sponsor, which offering was accepted in its final amended form by plaintiff Apartment Corporation and its individual purchasing shareholders at the October 25, 1984 closing. Purchasers were advised in their subscription agreements that no understandings or representations other than those set forth in the subscription and offering were to form part of the proposed contract and that once formed the contract would not be orally modified. The offer that was the subject of the subscription was, by its prominently displayed declaration, the "entire offer" concerning which oral modification was expressly barred. Each of the sponsor's principals certified that the offering was detailed, complete, current, accurate, did not omit material facts and afforded potential purchasers an adequate basis upon which to found their judgment. Finally, each of the

seven preclosing amendments to the offering plan filed by the sponsor and passed upon by the subscribers and potential purchasers stated "Except as set forth * * * there have been no other material changes in the Plan."

Manifestly, it is not possible to maintain that the agreements formed on the basis of the offering plan were anything less than complete, integrated expressions of the parties' contractual intent. Defendant does not argue to the contrary. Rather, it is urged that though the offering is undeniably complete it is "inadvertently" ambiguous and must be construed with the help of parol evidence. Specifically, it is claimed that subsequent to the initial offering, negotiations took place over a period of months between the tenant's committee, among whose members are the named plaintiffs in this suit, and the sponsor. An agreement was allegedly reached to reduce the purchase price and, commensurately, to reduce the reserve fund which must, according to Local Law No. 70, be at least 3% of the purchase price, and may, therefore, vary with alterations in the purchase price. It is further claimed that the parties agreed that $650,000 of the purchase price would be retained by the Apartment Corporation to be applied, first, to constitute the reserve fund, and then, assuming there was a surplus, to constitute the working capital fund. No documentary evidence is included in the record concerning the course and substance of the alleged negotiations other than a highly equivocal letter by the tenants' attorney which makes an offer concerning the reserve fund bearing no resemblance to what defendant claims was eventually agreed upon.

According to defendants, the parties' oral understanding was finally reduced to writing in the first amendment to the offering plan. Understandably, defendants-respondents are somewhat circumspect in their account of the first amendment's authorship. Harold Liebman, defendant sponsor's counsel and partner of defendant Dicta Realty Associates, states in his affidavit opposing plaintiff's motion for summary judgment that he "instructed the *Sponsor's* attorneys to prepare the First Amendment." (Emphasis added.) Later in the same paragraph, Liebman states, his instructions notwithstanding, that the preparation was "coordinated" with the tenant's attorney, Irving Sonnenschein, who ultimately composed the amendment "almost entirely" on his own. Still later in the affidavit, Liebman states that a draft of the amendment, though "virtually" written by Sonnenschein was, however, sent to him (Sonnenschein) before it was filed with the Attor-

ney-General. This rather cryptic account of the first amendment's composition is in no way made more substantial by the balance of the record. There is absolutely no documentary evidence of the claimed "coordinated" effort, nor is it in any way explained how the responsibility for drafting the amendment to the sponsor's offering plan, initially assigned by the sponsor's counsel to the sponsor's attorneys, happened to devolve upon the tenant's counsel.

In any case, as defendant alleges in its third counterclaim, it "caused the First Amendment to the Plan to be filed on or about March 29, 1984" and, as noted above, it did not thereafter make any attempt to change its provisions.

What then is the ambiguity which defendant claims warrants consideration of the above-alluded-to parol evidence concerning the first amendment's negotiation and drafting? The "obvious" though "inadvertent" ambiguity is said to arise from the use of the phrase "Working Capital Fund" to head item 4 of the first amendment (quoted above in its entirety). Defendant asserts in what can only be described as a non sequitur, that the words "reserve fund" are used "generically" throughout the plan, and that, therefore, the heading "Working Capital Fund" may actually refer to the reserve fund. Logic simply does not permit such a conclusion. Moreover, the premise that "reserve fund" is often used generically in the plan is incorrect. The only place defendant can point to where the words "reserve fund" are, in fact, used generically, and hence left uncapitalized, is in section T of the plan where it is explained that the working capital fund is a kind of reserve fund. There is, however, not the slightest suggestion that the working capital fund is, therefore, synonymous with the Local Law No. 70 reserve fund. Even a cursory examination of section T indicates that it refers under separate subheadings to two distinct funds *(see, supra)*. Indeed, as has been previously detailed, the plan, defendant's glib assertions notwithstanding, and section T in particular, rigorously distinguishes between the reserve and working capital funds.

Far from supporting the existence of defendant's claimed ambiguity, section T defines the uses to which the working capital fund may be put and so removes any possibility for confusion between it and the Local Law No. 70 reserve fund. As already noted, these uses include "working capital (for the Apartment Corporation), repairs, and other appropriate corporate purposes as determined by the Board of Directors." The identical language appears to describe the uses of the working capital fund referred to in item 4 of the first amendment.

There should not be the slightest doubt that the phrase "Working Capital Fund" was used consistently throughout the plan and the first amendment to denote a fund to be placed at the Apartment Corporation's disposal to meet its diverse cash flow needs during its initial phase of operation. This obviously does not describe the reserve fund required by Local Law No. 70. That fund's use is strictly circumscribed by the local law (Administrative Code of the City of New York § YYYY51-1.0 *et seq.*), a copy of which appears in the offering plan. In relevant part, the local law provides: "Within thirty days after the closing of a conversion pursuant to an offering plan the offerer shall establish and transfer to the cooperative corporation or condominium board of managers, a reserve fund *to be used exclusively for making capital repairs, replacements and improvements necessary for the health and safety of the residents of such buildings.*" (Administrative Code § YYYY51-3.0 [a] [emphasis added].)

" 'Capital replacement' " is defined as

"a building-wide replacement of a major component of the following systems:

"(1) elevator;

"(2) heating, ventilation and air conditioning;

"(3) plumbing;

"(4) wiring;

"(5) window;

"or a major structural replacement to the building". (Administrative Code § YYYY51-2.0 [c].)

Manifestly, the reserve fund is to be set aside exclusively for major repairs, improvements and replacements of a capital sort. It is accordingly not to be dissipated by the Apartment Corporation for the numerous and wide-ranging ends contemplated by the phrase "other appropriate corporate purposes as determined by the Board of Directors" employed by the offering plan to describe the uses of the working capital fund. The local law leaves absolutely no doubt on this score, stating as it does, in the bluntest fashion, "Such reserve fund also shall be exclusive of *any* working capital fund". (Administrative Code § YYYY51-3.0 [a] [emphasis added].) Put simply, I see no way of rationally construing the language in question from the offering plan's first amendment to refer even ambiguously to the Local Law No. 70 reserve fund.

Defendant also claims the existence of an internal ambiguity in the first amendment, pointing to the third footnote of the amendment's schedule B which states the assumptions

underlying its estimate of "Other Income" during the first year of the cooperative's operation. It is explained that the $40,000 estimate of "Other Income" "represents annual interest on the Working Capital and Reserve Funds to be retained by the Apartment Corporation at closing assuming that after adjustments there will be an average of $450,000 available, and interest is earned at the rate of 9% per annum." The basis of the assumption that an average of $450,000 would be available is not disclosed. Moreover, the reader is cautioned that schedule B "is not intended and should not be taken as a guarantee by anyone that the income * * * will be as set forth in the schedule, and it is likely that the actual income and expenses will vary from the amounts shown in the schedule."

I do not think that this footnote can be fairly construed to raise an ambiguity as to the working capital fund provision in the first amendment. Aside from the fact that defendant evidently had little enough confidence in the accuracy of its own estimates, the footnote does not give prospective purchasers adequate notice of the changes defendant doggedly maintains are contained in the "inadvertently ambiguous" first amendment. It cannot be reasonably expected that potential subscribers to a public offering, most of whom were not privy to the negotiating process underlying the offer, and who are, in any event, advised in the offering plan to which their subscription is invited that the only relevant representations are those made in the offer, will understand from a footnote in the back of the plan that despite the offer's repeated and prominent representations that the purchase price would be reduced to provide for two separate funds, the effect of the first amendment's provision entitled "Working Capital Fund", and making express reference only thereto, was to fix the combined amount for both the working capital and the reserve funds at $650,000. Surely, the disclosure obligation imposed on the offerer by General Business Law article 23-A (General Business Law § 352-e [1] [b]), requiring that the purchaser be provided with all the detailed information necessary to an informed decision, is not met by the highly tentative footnote at issue.

The point to be made is that, regardless of how the offering plan came to be, it is ultimately the offer of defendant sponsor. Any ambiguities in the offer are there because the sponsor included them or permitted them to remain when it "caused" the plan to be filed with the Attorney-General. If the claimed ambiguities were so subtle as to go inadvertently

undetected by the sponsor prior to filing, it cannot be realistically maintained that they would be apparent to the average purchaser. The purchaser who has justifiably relied on the offering plan should not run the risk that the plan's provisions, as he has understood them according to their expression in the plainest terms imaginable, will be subject to challenge after the closing on the basis of ambiguities so indiscernible that they crept into the plan through the sponsor's inadvertence. It does not do for defendant to claim that these ambiguities, once so veiled, are now so glaringly obvious as to raise factual questions warranting the denial of plaintiff's motion for summary judgment. In circumstances such as these the offerer must be held to the fair intendment of his written offering plan as it would be reasonably understood by an average purchaser. Judged by this standard, the subject offering plan is not ambiguous. It provides in the most unambiguous terms for a $650,000 working capital fund and for a separate reserve fund in an amount sufficient to meet the requirements of Local Law No. 70. If, however, we are to assume for the sake of argument that there is an ambiguity in the subject offering plan, it should, as a matter of law, be construed against the offerer who is ultimately responsible for the plan's preparation. (Cf. 67 Wall St. Co. v Franklin Natl. Bank, 37 NY2d 245.) This is especially true where, as here, the offerer is under a statutory obligation to make its offer detailed, complete, current, and accurate. (General Business Law art 23-A.)

Let us suppose, however, that when defendant either used or allowed the use of the expression "Working Capital Fund" in the offering plan's first amendment it merely succumbed to an inadvertently ambiguous manner of referring to the total amount destined for the reserve and working capital funds, and that this ambiguity is not to be construed against defendant. Let us suppose further that the agreement is as it is otherwise set forth in the first amendment, namely that the working capital fund there earmarked "for working capital, repairs and other appropriate corporate purposes" was to be employed by the Apartment Corporation first to fill the Local Law No. 70 reserve and then to constitute a working capital fund, and that although this fund was not to be reduced as a result of closing adjustments, such adjustments were, nevertheless, to be borne by the Apartment Corporation in an amount not exceeding $150,000. The conclusion is inescapable that the plan so construed violates Local Law No. 70 which, although previously quoted, bears some measure of repetition

here: *"Establishment of Reserve Fund.*—a. Within thirty days after the closing of a conversion pursuant to an offering plan the offerer shall establish and transfer to the cooperative corporation or condominium board of managers, *a reserve fund to be used exclusively for making capital repairs, replacements and improvements necessary for the health and safety of the residents of such buildings. Such reserve fund shall be exclusive of any other funds required to be reserved under the plan or applicable law or regulation of the state attorney general, except a fund for capital repairs, replacements and improvements substantially similar in purpose to and in an amount not less than the reserve fund mandated by this section. Such reserve fund also shall be exclusive of any working capital fund and shall not be subject to reductions for closing apportionments."* (Administrative Code § YYYY51-3.0 [a] [emphasis added].)

Clearly, the rigorously segregated reserve fund required by the local law "to be used exclusively for making capital repairs, replacements and improvements" was not established by the defendant's first amendment to the offering plan. At best, the first amendment established an all-purpose working capital fund which included sums whose unstated destination was a reserve fund to be established not by the offerer as the local law requires, but by the Apartment Corporation. Further, the fund established in the first amendment, while purportedly not subject to reduction for closing adjustments in the seller's favor, was reduced in practice to secure the Apartment Corporation's obligation for such adjustments amounting to $134,402.17. Consequently only $515,597.83 of the transferred first amendment fund was available to the Apartment Corporation during its first year of operation to meet the costly contingencies for which the Local Law No. 70 reserve fund was intended by the Legislature. It is undisputed that the reserve fund due the Apartment Corporation, computed on the basis of the total offering purchase price, was $578,650. Pursuant to the local law this amount should have been transferred to the Apartment Corporation within 30 days after the closing. The fact is that, within the 30-day time period, the only sum transferred by defendant for the possible establishment of a reserve fund was some $63,000 short of the amount mandated by Local Law No. 70.

It could not be clearer that acceptance of defendant's account of the "Working Capital Fund" provision from first amendment to the subject offering plan renders that provision offensive to the local law. Moreover, its offensiveness is not

excused by any agreement the parties may have made, because Local Law No. 70 does not permit the waiver of its provision: "Any provision purporting to waive the provisions of this title in any contract to purchase or agreement between an offerer and the cooperative corporation or the condominium board of managers pursuant to a conversion plan shall be void as against public policy." (Administrative Code § YYYY51-7.0.)

Thus, if construed in the manner advocated by defendant, the first amendment's working capital fund provision would, as a matter of law, have to be voided. It is a basic and longstanding rule of construction that, where possible, agreements are to be construed so as to render them legal and effective. (See, e.g., Shedlinsky v Budweiser Brewing Co., 163 NY 437; Galuth Realty Corp. v Greenfield, 103 AD2d 819.) Manifestly, this rule must be abandoned to attach any credence to the construction of the offering plan here advanced by defendant, entailing the illegality and avoidance of the subject working capital fund provision. This is especially true since plaintiffs' alternative interpretation of the plan comports in all respects with Local Law No. 70.

Although defendant steadfastly maintains that it does not seek reformation of the offering plan and that it makes no claim of fraud or mistake toward that end, the reality appears to be otherwise. For the logical consequence of this action's continuation in a manner favorable to defendant will be the avoidance of that provision by which defendant apparently agreed to furnish a $650,000 working capital fund in addition to the statutorily mandated Local Law No. 70 fund. By "explaining" the claimed "ambiguities" in the offering plan, defendant does nothing less than invite the voiding of the plan's disputed provision. It is hard to imagine a clearer use of parol evidence to impermissibly contradict, indeed to nullify, the terms of a subsequent written agreement.

It would seem clear that the reason why defendant has not taken the straightforward course of asserting a claim for reformation is that such a claim is utterly insupportable. Since no reformation claim is stated we must speculate as to its basis. No allegation whatsoever of mistake is made. Indeed, defendant maintains that the plan, although ambiguous, embodies the parties' agreement. This claim notwithstanding, defendant hints at fraud by alleging that somehow the tenants' attorney, Sonnenschein, was permitted, during the course of what is otherwise represented as a "coordinated" effort, to draft the first amendment to the offering plan.

Presumably, the tacitly alleged fraud is in Sonnenschein's misrepresentation of the parties' agreement or failure to apprise defendant that the first amendment did not accurately reflect that agreement. But, as defendants are no doubt aware, this is not enough to sustain a claim of fraud. It is simply impossible for defendant to maintain that it reasonably relied upon the tenants' attorney to draft the first amendment to its offer and that, thereafter, it continued to rely reasonably on Sonnenschein to advise it as to the amendment's contents and conformity with the parties' previous oral understanding. The most cursory perusal of the first amendment's plain language indicates that it refers only to the working capital fund. Defendant did not need the tenants' attorney to advise them of this. If defendant felt that the now-disputed language did not accurately capture the parties' agreement or was ambiguous, it could have revised the amendment before causing it to be filed, or filed a subsequent amendment in the more than six months between the first amendment's filing and the closing. That defendant did neither of these things indicates that it either reviewed the amendment and found it fairly representative of the parties' understanding, or that it failed to review the amendment adequately and so allowed the inclusion of the provision to which it now belatedly objects. Fraud is not supportable in either case.

It must be remembered that to survive a pretrial motion for dismissal, a claim for reformation on grounds of fraud, even if it is alleged with particularity (see, CPLR 3016), which it is not here, must be supported by a "high level" of proof in evidentiary form. (Chimart Assoc. v Paul, 66 NY2d 570, supra; Sagan v Sagan, 53 NY2d 635, 637; Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211.) The only express allegation of fraud made by defendants is in connection with their counterclaim for abuse of process, which we are dismissing. Otherwise, we are treated to gratuitous and highly equivocal allegations of impropriety which would not, even supposing they were true, support a claim for reformation on the basis of fraud. Here, as in Chimart, it is uncontroverted that the negotiations underlying the first amendment were undertaken by sophisticated and counseled businessmen and that the unambiguous language of the amendment reflects exactly what the moving party intended. (See, Chimart Assoc. v Paul, supra, at p 574.) Defendant's bare allegations, hinting but not saying in so many words that the agreement is a misrepresentation, are palpably insufficient to defeat plaintiff's motion for summary judgment. (Supra.)

The issue for this court is not whether, based on sheer speculation, we are to reward possible fraud on the one hand or excuse possible negligence on the other. The question is whether the unambiguous terms of a public offering, upon which several hundred subscribers have relied, are to be enforced and whether the offering is, therefore, to comport with the clear mandate of Local Law No. 70. As a matter of law it should be evident that the plan must be enforced according to its plain, unambiguous terms, and that plaintiffs are, therefore, entitled to summary judgment.