**305 EAST 40TH GARAGE CORP., Plaintiff,**

v.

**305 EAST 40TH OWNERS CORP., Defendant.**

**No. 88 Civ. 6073 (MJL).**

United States District Court, S.D. New York.

Sept. 16, 1993.

Robinson Silverman Pearce Aronsohn & Berman, New York City, by Robert A. Wolf, and Kenneth H. Amorello, for plaintiff.

Carb, Luria, Glassner, Cook & Kufeld, New York City, by James E. Schwartz, for defendant.

## OPINION AND ORDER

LOWE, District Judge.

Before this Court is the summary judgment motion filed October 16, 1992 by plaintiff 305 East 40th Garage Corp. ("305 Garage"). Also before the Court is the partial summary judgment motion filed October 16, 1992 by defendant 305 East 40th Owners Corp. ("305 Owners"). For the reasons stated below, 305 Garage's motion for summary judgment is denied, and 305 Owners' motion for partial summary judgment on the issues of timeliness of termination, constitutionality of 15 U.S.C. § 3607, and estoppel is granted.

## BACKGROUND

The facts pertaining to the present motions for summary judgment are uncontested. The property at 305 East 40th Street ("the Property") comprises residential apartments, commercial space, laundry facilities, common areas for tenants' use, and a parking garage. On January 6, 1983, the Property was converted from rental apartments to cooperative ("co-op") ownership pursuant to a non-eviction [1] offering plan ("the Plan") sponsored by the developer Parman Co. ("Parman"). 305 Owners became the owner and operator upon closing. As is typical in such conversion plans, 305 Owners was controlled by Parman at the time of closing, although by August 19, 1983, Parman no longer controlled a majority of the seven-member board of directors of 305 Owners.

The Plan provided for the disposition of ownership shares that were unsold at the time of closing. Unsold shares were to be purchased by individual holders produced by Parman and whose obligations were guaranteed by Parman. Two such individuals ("the Holders") purchased the shares unsold on the closing date. About one month after closing, the Holders owned approximately 87,000 shares out of a total of 222,015 shares.

The Holders' proprietary lease and 305 Owners' by-laws, both of which appear in Part II of the Plan, give the Holders rights not accorded other shareholders. The proprietary lease and the by-laws differ, however, on the specifics of the duration and substance of those rights. Regarding duration, the by-laws state that the rights were to be effective as long as the Holders owned 25% of the outstanding shares. The proprietary lease states that the rights were to be effective either as long as the Holders owned 25% of outstanding shares, or for a period not to

---

**1.** Tenants who chose not to purchase ownership shares were entitled to remain as rental tenants with the full protection of New York rent stabilization laws and regulations.

exceed two years from closing, whichever was sooner. The two year period expired on January 6, 1985, but the Holders owned 25% of outstanding shares until March 1987.

Regarding the substance of the rights, the proprietary lease gives the Holders a veto power over the board of directors of 305 Owners with respect to the following decisions:

1. Whether to hire additional employees or provide services and equipment, beyond those specified in the Plan or required by law;

2. Whether to increase 305 Owners' mortgage indebtedness, alter the terms of the mortgage, enter any new mortgage or any contract to sell or lease the Property; and

3. Whether to increase reserves beyond the provision of the Plan (except for annual carry-over amounts).

The by-laws match these veto powers, and contain three additional powers. First, the Holders are given the additional power to veto capital improvements to the Property. Second, the Holders are given the additional power to veto decisions to lease *portions* of the property, with the exception of proprietary leases and, in the event of default by the garage tenant, the garage lease. Third, the Holders are given the additional power to veto amendments to the by-laws. A different durational limit is attached to the last of these powers; by-laws amendments can be vetoed as long as the Holders own *any* shares.

The Plan, in the form it took at closing, provided that 305 Owners would lease the parking garage at the Property to Parman's affiliate, 305 Garage, for fifteen years with an option to renew for two additional five year periods. On June 24, 1988, 305 Owners delivered to 305 Garage a notice of termination of the garage lease pursuant to the Condominium and Cooperative Conversion Protec-

tion and Abuse Relief Act of 1980 ("the Act"), 15 U.S.C. §§ 3601–16.[2]

305 Garage brought this action on August 31, 1988, seeking a declaratory judgment that 305 Owners' purported termination of the garage lease was null and void, and injunctive relief against any further attempt to terminate the lease under the Act. Cross-motions for summary judgment were filed on October 16, 1992. 305 Garage moves for summary judgment on the grounds that 305 Owners' purported termination was not timely under § 3607(b)(1) and that § 3607 violates the Due Process Clause of the Fifth Amendment to the United States Constitution. 305 Owners moves for partial summary judgment dismissing so much of the complaint as seeks declarations that the purported termination was untimely, that the Act is unconstitutional, and that the right to terminate the garage lease was waived by 305 Owners' execution of an estoppel certificate. The motions thus raise common issues except for the estoppel issue raised by 305 Owners.

## DISCUSSION

A court may grant summary judgment only when it is clear that no genuine issue of material fact remains to be resolved at trial and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The parties agree that certain potentially dispositive legal issues are ready for decision at this stage of the case.

Section 3607 of the Act enables a co-op association (such as 305 Owners) to terminate self-dealing contracts that were made while the association was controlled by a developer (such as Parman). Self-dealing contracts are implicitly defined in the statute as including those between the association and an affiliate of the developer, entered while the association was controlled by the developer, lasting

---

**2.** 305 Garage raises two issues concerning the propriety of the notice, but concedes them for purposes of these motions for summary judgment. First, the notice was premised upon a vote allegedly taken at a meeting of the shareholders of 305 Owners on or about July 14, 1987. 305 Garage disputes the legitimacy of that vote. Second, the notice stated that termination was

pursuant to § 3608 of the Act. A letter accompanying the notice referred to § 3607 of the Act rather than § 3608. The reference to § 3608 was erroneous, because § 3608 applies only to leases entered prior to June 4, 1975. 305 Garage contends that the notice was defective because of that error.

more than three years, and providing for the operation, maintenance or management of the association or of property serving the co-op owners.[3] The parties do not dispute that the garage lease fits these requirements and therefore is a self-dealing contract within the terms of § 3607. The parties do dispute whether the purported termination was timely, whether the Act is constitutional, and whether an estoppel should be found.

### A. Timeliness

305 Garage contends that the purported termination of its lease was not timely within the terms of the Act. Section 3607(b) states:

> (b) Any termination under this section may occur only during the two-year period beginning on the date on which—
>
> (1) special developer control over the association is terminated; or
>
> (2) the developer owns 25 per centum or less of the units in the conversion project,
>
> whichever occurs first.

15 U.S.C. § 3607(b).

305 Garage contends that the two-year period expired prior to the purported termination because special developer control ended once the developer, Parman, no longer controlled a majority of the board of directors of 305 Owners. 305 Owners maintain that special developer control continued as long as the Holders were entitled to exercise the veto powers outlined earlier. 305 Garage replies that the Holders are not developers; that their powers do not amount to "special developer control" within the meaning of the statute; and that in any event those powers expired by the terms of the Plan two years after closing, on January 6, 1985. 305 Owners contest all of those points.

### 1. Holders and Developers

305 Garage contends that although the Holders might possess some form of control, it is not special *developer* control. Section 3603(14) defines "developer as follows:

> (14) developer means (A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association[.]

15 U.S.C. Section 3603(14) (emphasis added).

305 Owners contend that the Holders are successors who offer to sell or sell their interests and who have authority to exercise special developer control including the right to exercise control of the owners' association. 305 Owners read the word "successor" to mean any purchaser of a developer's property interest. The implication is that the only questions are whether a purchaser "offers to sell or sells his interest" and whether that purchaser enjoys special developer control.

305 Garage asserts that the Holders are not successors of the developer, Parman, for two reasons. First, the Holders "paid valuable consideration." Pl.'s Reply Br. at 7. 305 Garage thus seems to reason that the term "successor" can refer only to the law of descent and distribution (in the case of indi-

---

3. Section 3607(a) states in full:

(a) Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;

(2) is between such unit owners or such association and the developer or an affiliate of the developer;

(3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and

(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer,

may be terminated without penalty by such unit owners or such association.

15 U.S.C. § 3607.

vidual developers) or to the law of corporate perpetuation (in the case of corporate developers). *See Black's Law Dictionary* 1432 (6th ed. 1990) (defining successors as "[t]hose persons, other than creditors, who are entitled to property of a decedent under his will or succession statute.").

The Supreme Court has noted that "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context." *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees & Bartenders Int'l Union*, 417 U.S. 249, 263 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974). The present case calls upon this Court to make sense of the term in the context of the Act.

Section 3607(b) tolls the period for contractual termination as long as a developer retains special control over the owners' association. That much is clear, and makes sense; a developer might use its control to hinder efforts at termination. Equally clear is that the statute applies to control held by *developers*. Mere existence of special control over the owners' association by a stranger to the original offering plan does not toll the termination period.[4] This, too, makes sense; a stranger to the offering plan does not benefit from a developer's self-dealing contract, and should not be expected to use its control to hinder termination. Indeed, the stranger should be expected to *favor* termination of a contract that robs the owners' association of the fullest exploitation of its assets.

■ The problem in this case is that holders of unsold shares, who own for the sole purpose of selling and who possess special control, lie somewhere between an original developer and a perfect stranger to the original deal. The Court must decide whether § 3603(14)(B) treats such holders as developers or as perfect strangers.

The Court finds that the term "successor" in § 3603(14) should be interpreted in a general sense to include those who are purchasers of ownership shares from a developer. Whether a successor is also a developer then depends on whether the additional objective

requirements of § 3603(14) are met. Section 3603(14) treats successors as developers only when they: (1) "offer[ ] to sell or sell[ ]" their interests; and (2) possess special developer control. These added requirements—indeed, all of § 3603(14)(B)—would be of doubtful necessity if the term "successor" were limited to those who take the place of the developer through inheritance or corporate perpetuation. The Court reads the requirements as establishing the difference between successors who are ordinary purchasers for value and successors who are developers.

A liberal interpretation of the term "successor" also comports with the Act's goal of protecting the individual tenant/owner in the conversion process. The interests of purchasers who are just conduits for the resale of units—in the language of the instant Plan, "*Holders*" of "*unsold*" units—are not necessarily identical to long-term individual ownership interests. And the "Holder" of all "unsold" shares is more likely than the average purchaser for value to have a close relationship to the original developer, especially where, as here, the developer is responsible for producing the holders and guaranteeing their obligations. These considerations weigh in favor of a general rule that purchasers engaged in resale and who possess special control are developers for purposes of the Act.

305 Garage's second argument against treating the Holders as developers is that the Holders' control was neither lengthy enough nor substantial enough to establish the presence of special developer control within two years prior to termination. That contention points up an interesting circularity within § 3603(14)(B): a court is led to a determination of whether successors are developers by determining whether the successors possess special developer control. The question is addressed in the next section, and is answered in the affirmative.

**2. The Holders' Powers and Special Developer Control**

■ 305 Garage asserts that special developer control existed over 305 Owners only as

---

4. Perhaps needless to say, § 3603(22) permits a finding of "special developer control" only if the

possessor of the control is a developer. 15 U.S.C. § 3603(22).

long as the developer, Parman, controlled a majority of the 305 Owners board of directors. According to 305 Garage, special developer control ends when a developer ceases to control a majority of the board of directors of a co-op association. 305 Garage cites cases in which special developer control ended upon election of a board majority not controlled by the developer, Pl.'s Reply Br. at 12–16, and characterizes its position as the "clear majority rule." *Id.* at 16.

This Court agrees that special developer control *may* end when an independent board majority assumes power. But the terms of the statute would be flatly contradicted by a holding that special developer control is nothing more and nothing less than board majority control. The statutory definition of special developer control encompasses every manner of power by which a developer "may control *or* direct the unit owners' association *or* its executive board." *Id.* (emphasis added).[5] This is broad and inclusive language. It would be a strange way indeed to express the simple idea that special developer control means control of a majority of a board of directors.

The clearest holding on the issue in fact goes against 305 Garage's position. *Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F.Supp. 128 (S.D.N.Y.1990). The *Coliseum* Court explained:

These provisions [of the Offering Plan] allow the Developer to veto certain decision made by the Association, *inter alia*, to increase the number or change the type of employees from those described in the Offering Plan, to restructure or to increase the amount of indebtedness of the Association, or to make major capital improvements or to levy assessments for such improvements or repairs unless required by law. It is clear to the Court that these retained powers allow the Developer to

exercise substantial control over the business affairs of the Association. Without more specific guidance from Congress or the courts, this Court must rule that such powers constitute "special developer control" under the Act.

*Id.* at 136 (footnote omitted).

305 Garage urges that *Coliseum* is "at odds with every other reported case on this issue." Pl.'s Reply Br. at 13. A review of those cases belies 305 Garage's characterization. Two examples will suffice. First, 305 Garage cites *Barnan Assocs. v. 196 Owners' Corp.*, 797 F.Supp. 302 (S.D.N.Y.1992). Far from being at odds with *Coliseum*, the *Barnan* decision quotes the portion of *Coliseum* quoted above, and concludes that "[n]o such broad powers are retained by the Sponsor in the instant matter." Rather, in *Barnan* a developer-affiliated property manager had power:

(1) to maintain, repair, and alter the Building without the board's consent in the event that an "emergency condition" exists; and (2) to contract for services, purchase supplies, pay bills, and control employees without full review by the board. [Other provisions] limit[ed] ... the board's ability to reduce the number of employees, services, equipment and insurance coverage until 50% of the shares [were] owned by the tenant-shareholders.

*Id.* at 307. The Court concluded that those powers "serve[d] only to protect the property, not to permit its disposition or substantial modification." *Id.* The powers concerned property management and superintendence, not property use. The *Barnan* decision rationally distinguishes *Coliseum*.

The second example that belies 305 Garage's characterization of the precedents is the Second Circuit's decision in *2 Tudor City Place v. 2 Tudor City Tenants*, 924 F.2d 1247 (2d Cir.1991). According to 305 Garage, "a

---

5. The definition states in full:
   "[S]pecial developer control" means any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exer-

cise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time[.]
15 U.S.C. § 3603(22).

review of the appellate record submitted to the Second Circuit in *Tudor City* evidences ... [that] 'veto powers' quite similar to those involved in *Coliseum* (and to those involved in the instant action) were also present in that case." Pl.'s Reply Br. at 14. Portions of the appellate record in *Tudor City* are attached to 305 Garage's reply brief. A review of those portions and the rest of the *Tudor City* decision reveals that the *Tudor City* decision was not presented with, and did not decide, whether such veto powers can constitute special developer control. If anything is "specious[ ]," Pl.'s Reply Br. at 16 n. 6, it is 305 Garage's characterization of the precedents.

No decision has held that control of a board majority is the exclusive measure of special developer control. Quite the contrary, the statute's plain language and the judicial decisions to date command the conclusion that special developer control extends beyond simple control of a board majority.

■ The question remains whether the powers possessed by the Holders in this case constitute special developer control. The *Coliseum* and *Barnan* decisions strongly suggest so. The Holders' powers are a lot like those in *Coliseum,* and less like those that "serve[d] only to protect property" in *Barnan.* And the powers were certainly not attributable to "the same voting share as would be allocated" to any other owner of units. 15 U.S.C. § 3603(22).

305 Garage points to numerous instances in which the existence of the Holders' veto powers did not prevent 305 Owners from taking desired action, the implication being that the Holders' powers posed no impediment to termination. Pl.'s Reply Br. at 17–19. The Court finds these anecdotal references irrelevant to whether the statutory requisites of special developer control were satisfied. The question is whether special developer control existed, not whether or how it was exercised.

The Court finds that the Holders possessed special developer control by virtue of the veto powers that are common to the proprietary lease and the by-laws: whether to hire additional employees or provide services and equipment beyond those specified

in the proprietary lease or required by law; whether to increase mortgage indebtedness, alter the terms of the mortgage, enter any new mortgage or any contract to sell or lease the Property; and whether to increase reserves beyond the provision of the Plan (except for carry-over amounts). The Court further finds that the Holders possessed special developer control by virtue of the veto powers that are unique to the by-laws: whether to make capital improvements to the Property; whether to lease portions of the property (with the exception of proprietary leases and, in the event of default by the garage tenant, the garage lease); and whether to amend the owners' association by-laws.

### 3. The Plan and the By–Laws

As explained earlier, the proprietary lease enumerated a set of veto powers and stated that those powers would be effective either as long as the Holders owned 25% of outstanding shares or until two years after closing, whichever was sooner. The by-laws enumerated the same powers, enumerated some others as well, and stated that the powers would be effective as long as the Holders owned at least 25% of outstanding shares. Both the proprietary lease and the by-laws are part of the Plan, and from the arguments and exhibits submitted by the parties it appears that neither one purports to control the other in the event of a conflict.

■ The Court is faced with three choices regarding the durational limits of the Holders' powers: (1) give exclusive effect to the Plan, so that all veto powers are subject to the two-year limit even though some are not enumerated in the Plan; (2) give exclusive effect to the by-laws, so that all veto powers are free of the two-year limit even though some of them are stated in both the Plan (which includes a two-year duration) and the by-laws (which state a 25%–based duration); or (3) give effect to the two-year duration for those veto powers listed in both the Plan and the by-laws, and the 25%–based duration for those veto powers listed only in the by-laws. Not surprisingly, 305 Garage urges the first possibility and 305 Owners urges the second.

For the reasons stated below, the Court settles upon the second.

The first possibility—305 Garage's position—is the least tenable. As 305 Owners points out, "[i]t is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual. Where two seemingly conflicting provisions can be reconciled, a court should do so in order to give both effect." *Hauser v. Western Group Nurseries, Inc.*, 767 F.Supp. 475, 488 (S.D.N.Y.1991) (citations omitted). These principles of interpretation would be ill-served if the two-year limit that appears only in the Plan were imposed on the veto powers that appear only in the by-laws. The 25%–based limit explicitly stated in the by-laws would be overridden and rendered ineffectual; the result would be conquest rather than concord. Such a result is unnecessary. The Court interprets the 25%–based limit as applicable at least to the powers that appear only in the by-laws.

The next question is how to deal with the powers that appear in both the proprietary lease and the by-laws—powers for which different durational limits are stated. Although provisions should not be interpreted as meaningless, the inescapable conflict between the different limits can be resolved only by enforcing one rather than the other.[6] 305 Owners offers a rational basis for enforcing the durational limit of the by-laws rather than the durational limit of the proprietary lease. The developer, Parman, drafted both documents, and therefore should have ambiguities construed against it (and its affiliates). A New York Court of Appeals case involving Parman supports this approach. *305 East 24th Owners Corp. v. Parman Co.*, 69 N.Y.2d 991, 517 N.Y.S.2d 710, 510 N.E.2d 794 (1987). The Court of Appeals adopted the opinion of the dissenting judge below, who found that any ambiguity in the offering plan "should, as a matter of law, be construed against the offeror who is ultimately responsible for the Plan's preparation." *305 East 24th Owners Corp. v. Parman Co.*, 122 A.D.2d 684, 505 N.Y.S.2d 999, 1010 (1986), *aff'd*, 69 N.Y.2d 991, 517 N.Y.S.2d 710, 510 N.E.2d 794 (1987). That approach is especially appropriate to the application of a statute aimed at remedying perceived inequalities in power between developers and tenants.

305 Garage observes that state law prohibits sponsors from retaining veto power over expenses for more than five years after closing. N.Y.Comp.Codes R. & Regs. tit. 13, § 18.3(v)(5). 305 Garage asserts that without the two-year limit in the proprietary lease, the Plan would have violated § 18.-3(v)(5) and would have been rejected by the New York State Attorney General's office. 305 Garage also asserts that the Plan would have been compromised by the failure to disclose the five-year regulatory limit, although no specific consequence is stated.

The Court rejects these assertions for two reasons. First, § 18.3(v)(5) applies only to veto powers over decisions relating to expenses. Not all of the Holders' veto powers are related to expenses, and those that are not (especially the power over by-laws amendments) are sufficient to establish special developer control. Second, 305 Garage fails to cite any authority for the proposition that the whole Plan would have been scuttled as violative of § 18.3(v)(5) and State disclosure requirements if the 25%–based limit were stated without reference to the five-year regulatory limit. *Cf. Rego Park Owners, Inc. v. Rego Park Gardens Assocs.*, 191 A.D.2d 621, 595 N.Y.S.2d 492, 494 (App.Div. 1993) (suggesting that failure to disclose unfavorable engineering reports did not amount to "active concealment"); *Phoenix Tenants Ass'n v. 6465 Realty Co.*, 119 A.D.2d 427, 500 N.Y.S.2d 657 (1986) (excusing failure of initial offering plan to disclose existence of federal Condominium and Cooperative Conversion Protection and Abuse Relief Act of 1980). The position taken by 305 Garage is

6. Actually, 305 Owners suggests, as a fourth possible interpretation, that there is no conflict. According to 305 Owners, the two-year limit is consistent with the 25%–based limit because the powers and limits in the Plan and by-laws can be enforced independently; enforcement prior to the two-year limit could be pursuant to either the Plan or the by-laws, but enforcement after the two-year limit would have to be pursuant to the by-laws. The Court does not find this argument convincing. The inconsistency between the Plan and by-laws is manifest.

too speculative to guide interpretation of the proprietary lease and by-laws. Between the two choices—interpreting ambiguities in the drafter's favor, and interpreting them against the drafter and implying the regulatory five-year limit—the Court finds the latter to be more sound.

The proprietary lease and the by-laws are in conflict, and that conflict is resolved in favor of the 25%-based limit of the by-laws. The Holders retained special developer control until their ownership dropped below 25% of outstanding shares, which did not occur until March 1987. The period for termination under § 3607 did not expire until March 1989. 305 Owners delivered notice of termination of the garage lease in June 1988. The termination was timely.

### B. Constitutionality

■ 305 Garage contends that § 3607 of the Act violates the Due Process Clause of the Fifth Amendment to the United States Constitution. The Court rejects that contention.

Challenges to the constitutionality of the Act have already been brought. None has succeeded.[7] The same procedural due process argument now raised by 305 Garage—that § 3607 unconstitutionally enables termination of contracts without judicial hearing—was found unlikely to succeed on its merits in a state court action for injunctive relief. *233 East 86th Street Corp. v. Park East Apartments, Inc.*, 131 Misc.2d 242, 499 N.Y.S.2d 853, 856–57 (Sup.Ct.), *aff'd*, 123 A.D.2d 536, 506 N.Y.S.2d 658 (1986).

■ Contractual obligations can be a form of property protected against deprivation without due process of law, although the contours of that property interest are yet to be settled. *See Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 782–83 (2d Cir. 1991); *Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir.1988). Despite any uncertainty in details, it is safe to assume that outright termination of a contract rises to "the level of a property interest entitled to the protections afforded by the Due Process Clause." *Ezekwo*, 940 F.2d at 783.

Due process requires notice and an opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). Section 3607 requires notice of termination ninety days prior to termination.[8] This requirement satisfies the Due Process Clause. Notice is explicitly required, and an opportunity to be heard is implicit in the ninety day period.

305 Owners characterizes 305 Garage's position as resting on an economic substantive due process argument. 305 Garage denies that, but certain of its statements suggest otherwise. For example, 305 Garage complains of the "conspicuous absence of any modicum of judicial review *or flexibility* in Section 3607." Pl.'s Mem. at 26. 305 Garage thus complains not only about the supposed lack of notice or opportunity to be heard, but also about the fact that a hearing would not serve much purpose because § 3607 empowers an owners' association to terminate a contract for any reason or no reason. That is a complaint grounded in substance, not procedure—it is a matter of substantive, not procedural, due process. Substantive due process has, of course, been abandoned as a basis for judicial review of economic legislation.

Notice and an opportunity to be heard might indeed seem useless to a party whose contract can be terminated for no reason. But notice and an opportunity to be heard are not useless. Not all contracts are subject to termination under § 3607, and the notice provisions of § 3607(d) can be of great use when a contract that falls outside § 3607 is at stake. *See, e.g., 181 East 73rd Street Co. v. 181 East 73rd Street Tenants Corp.*, 954 F.2d 45, 49–50 (2d Cir.1992) (rejecting ratification claim); *2 Tudor City*, 924 F.2d 1247 (rejecting claim that owners' association

---

7. The Second Circuit rejected a Fifth Amendment "takings" challenge to § 3607 in *2 Tudor City*, 924 F.2d at 1254. 305 Garage offers a variation on the Fifth Amendment theme by couching its challenge in terms of procedural due process.

8. Section 3607(d) states: "Following the unit owners' vote, the termination shall be effective ninety days after hand delivering notice or mailing notice by prepaid United States mail to the parties to the contract." 15 U.S.C. § 3607(d).

was not a party to original contract, and rejecting disclosure defense); *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 197–201 (2d Cir.1987) (finding requirements of § 3607 met and rejecting tenant negotiation defense).

The Court respects the quandary of parties who wish to contract with developer-controlled owners' associations. A contract terminable unilaterally and at will might seem to be not worth the paper on which it is written. The option, however, is not to escape the statute through judicial review. The option is to not enter the contract. Thus, it may be that § 3607 undermines the incentive to contract with developer-controlled owners' associations. But legislation is not unconstitutional just because it unwisely discourages economic activity.

Section 3607 is not unconstitutional. Procedural due process requires notice and an opportunity to be heard, which § 3607 provides.

### C. Estoppel

■ 305 Owners moves for dismissal of 305 Garage's claim that the right to terminate the lease was waived by execution of an estoppel certificate by 305 Owners' board of directors in December 1987. 305 Owners cites *181 East 73rd Street*, 954 F.2d at 50, for the proposition that the power to waive, like the power to terminate, resides in the shareholders, not the board. 305 Garage responds that *181 East 73rd Street* is distinguishable because the estoppel certificate there was executed prior to the owners' termination vote, whereas 305 Owners' board executed a certificate after the owners' termination vote. That argument is frivolous. The essence of *181 East 73rd Street* concerns *who* executes the waiver, not *when* it is executed. The board of 305 Owners had no more authority to waive the right to terminate than the board in *181 East 73rd Street*.

305 Garage also asserts that the termination vote by 305 Owners was "effectively rescinded by virtue of the shareholders' having permitted nearly a full year to elapse" between the vote and delivery of notice. Pl.'s Reply at 28. 305 Garage cites no authority for a "nearly a full year" shelf life

rule for termination votes under § 3607. Perhaps some principle of contemporaneity should be articulated, but the facts of the present case do not call for it.

305 Garage's estoppel claims have no merit.

### CONCLUSION

305 Garage's motion for summary judgment is denied.

305 Owners' motion for partial summary judgment on the issues of timeliness of termination, constitutionality of 15 U.S.C. Section 3607, and estoppel is granted.

Discovery in this case concluded on June 30, 1992. The Joint Pre–Trial Order was to be submitted on or before July 30, 1992. The Court has yet to receive the Joint Pre–Trial Order. The parties are hereby ordered to submit their Joint Pre–Trial Order on or before October 15, 1993.

It Is So Ordered.