**BLEECKER CHARLES COMPANY,
Plaintiff.**

v.

**350 BLEECKER STREET APART-
MENT CORPORATION, De-
fendant,**

v.

**Bleecker Parking Corp., Additional
Counterclaim Defendant.**

No. 00 Civ. 7827(GEL).

United States District Court,
S.D. New York.

Oct. 4, 2001.

Dale A. Schreiber, Alison B. Feld, Proskauer Rose LLP, New York, NY, for Plaintiff Bleecker Charles Company.

Robert N Fass, Friedman, Krauss & Zlotolow, New York, NY, for Defendant 350 Bleecker Street Apartment Corporation.

## OPINION AND ORDER

LYNCH, District Judge.

This action requires the interpretation of the Condominium and Cooperative Conversion Protection and Abuse Relief Act, 15 U.S.C. §§ 3601–3616 ("the Act"). Because the sponsor of a conversion of a building from rental to cooperative, generally the owner of the building, has effective control of the cooperative in the initial stages, and thus may have the opportunity to have the cooperative enter into long-term leases or other arrangements favorable to itself, the Act offers a cooperative corporation a limited time period, after the sponsor's control is reduced, during which it may terminate contractual commitments entered into while the sponsor dominated the cooperative.

In this case, the plaintiff Bleecker Charles Company ("the Sponsor") converted its building at 350 Bleecker Street to a

cooperative in 1985, by conveying ownership in the building to the defendant 350 Bleecker Street Cooperative Corporation ("the Co-op"). At the same time the Co-op, all of whose units and related shares were at that time still owned by the Sponsor,[1] leased the ground-floor commercial space and underground garage back to the Sponsor for 75 years.[2] It is not for this Court to evaluate the fairness of the terms of the lease.[3] Suffice to say that the Act is intended to deal with the potential for self-dealing inherent in the situation, and that the lease terms are sufficiently favorable to the Sponsor that the Co-op in 2000 sought to invoke the Act's terms and terminate the lease.

Under the Act, however, such a termination is only permitted within a two-year "window" beginning (so far as this case is concerned) no later than the date on which the Sponsor owned no more than 25 per cent of "the units in the conversion project." 15 U.S.C. § 3607(b)(2). The plaintiff Sponsor brought this action for declaratory and injunctive relief, asking the Court to hold the Co-op's attempted termination of the lease invalid because, among other reasons, the attempt to terminate the lease in 2000 came too late—the Spon-

sor's share of the total units having dropped below 25%, according to its calculations, no later than October 16, 1997. The Co-op rejects this analysis, and seeks by counterclaim a declaration that the lease is invalid, arguing that the Sponsor owned more than 25% of the units until at least November 5, 1998. Both plaintiff Sponsor (joined by the sublessee of the garage as additional counterclaim defendant) and the defendant Co-op have moved for summary judgment, each arguing that on the undisputed facts about the ownership of various units of the cooperative, its calculations better accord with the language and intent of the Act.

For the reasons that follow, summary judgment is granted for the plaintiff Sponsor.

### Background [4]

At the time of the conversion in 1985, the Sponsor owned all of the 137 apartment units in the building.[5] The Sponsor immediately began to sell the apartments, but because the conversion was made under a non-eviction plan, under which tenants in the building were permitted either to purchase their units or to remain as tenants under their existing leases and any

---

1. Although it is common to speak of the "owner" of a cooperative apartment, and that usage will occasionally be followed in this Opinion, the term is not strictly correct. In a cooperative building, the cooperative, a corporation, owns the building in fee simple. The "owners" of individual apartments in fact hold the apartments under long-term proprietary leases, and own shares in the cooperative corporation, which are assigned to each leased apartment.

2. The Sponsor subsequently subleased the garage to Bleecker Parking Corporation, which has been added to this lawsuit as a counterclaim defendant.

3. The Act permits an action by cooperative unit owners, under certain circumstances, to

bring an action to seek relief from self-dealing leases found to be "unconscionable." 15 U.S.C. § 3608 The Co-op does not invoke this provision.

4. Unless otherwise indicated, the following facts are drawn from the "Stipulation of Undisputed Facts" (hereinafter "Stip.") jointly submitted by the parties in conjunction with the cross-motions for summary judgment presently before the Court.

5. One additional unit, containing a laundry room and an apartment reserved for the building's superintendent, was owned by the Co-op itself, and both parties agree that it should be excluded from the relevant calculations (See Pl. Mem. at 4; D. Mem. at 2, Stip. ¶ 3.)

applicable statutory tenure, the Sponsor retained ownership of more than 25% of the units, both parties agree, for more than a decade.

By October 16, 1997, the Sponsor had sold 103 of the original units, and retained title to only 34, or 24.8%. Thus, the Sponsor argues, by that date it owned less than 25% of the units in the building, and the two-year window for termination of its commercial lease opened. On this simple analysis, the window closed on October 16, 1999, and the effort to terminate the lease in 2000 was untimely.

The Co-op, however, disputes the Sponsor's calculations. First, it contends that the 25% calculation should be based not on the number of units (137) in the building at the time of conversion, but on the number of units that exist at the particular time the calculation is made. It is not unusual for co-op apartments in Manhattan buildings to be combined to make larger living spaces, with approval of the co-op, for example, a resident may purchase an adjoining apartment and combine the two into a single larger residence. (It is less common, but equally possible, for a large apartment to be subdivided, and sold as two separate, smaller apartments to two new owners.) Thus, the number of separate living spaces (and therefore, the Co-op argues, the number of "units") in the building can change over time. Putting aside for the moment the details of the various transformations that have occurred in the building in question since 1985, the Co-op contends that the number of units in 1997 was less than 137, and that based on the reduced number of extant units, the Sponsor continued to own more than 25%

of the units (and the window for termination of the garage lease therefore did not open) until November 5, 1998, making the Co-op's action timely.

Second, the Co-op argues that even using 137 units as a base, the Sponsor's calculation does not include two units that were sold to persons associated in some way with the Sponsor. The Co-op contends that these units should be attributed to the Sponsor, and such attribution would also raise the Sponsor's percentage ownership above 25% until a date late enough to make the Co-op's termination of the garage lease effective.

The issue before the Court, then, is to determine how the 25% calculation should properly be made under the provisions of the Act.

### Discussion

For purposes of these motions, the parties agree that the garage lease at issue in this case meets the requirements of 15 U.S.C. § 3607(a) and is therefore subject to termination pursuant to the Act. (*See* Pl. mem. at 11, n. 5.) The Act provides, however, that any such termination "may occur *only* during the two-year period beginning on the date on which ... the developer owns 25 per centum or less of the units in the conversion project." 15 U.S.C. § 3607(b)(2) (emphasis added).[6] The issue presented thus involves the proper calculation of the 25% ownership specified in the statute.

### I. The Denominator: How Many Units Are There?

■ It is unlikely that the framers of the Act specifically considered the situa-

---

**6.** The statute actually provides that the window opens on the occurrence of the earlier of two specified events. *See* 15 U.S.C. § 3607(b). In the circumstances of this case, however, the only relevant date is that speci-

fied in the text. The parties apparently agree that the Sponsor's claim of untimeliness can only succeed if the window opened, as the Sponsor contends, on the date when it argues it owned fewer than 25 % of the co-op units.

tion confronting the Court. Nothing in the Act gives any indication that the Act contemplates that the number of "units" in a co-operative or condominium can change over time. But as the facts of this case demonstrate, the number of "units," at least in the ordinary vernacular sense of the term, can indeed change. At the time of the conversion, the parties agree, there were 137 cooperative units, both as defined in the relevant documents describing the conversion plan and in the ordinary sense that there were 137 separate apartments or dwelling units, each occupied by a different tenant. Since that time, however, a number of changes have been made in the apartments. In some cases, walls between adjoining units were removed, and the apartments reconfigured so that what were formerly two or even three dwelling units now constitute (both de facto and for purposes of local zoning and building codes) a single apartment with only one kitchen. (Lilien Rep. Aff. ¶ 11; Fass Aff. Ex. B.) In at least one case, a door was installed permitting access between apartments, but more than one kitchen remains in the conjoined apartments, which apparently means that the formerly separate apartments, though mutually accessible, are still treated for purposes of local zoning law as distinct dwelling units. (D. Mem. at 3.) In another case, a portion of a formerly common hallway was enclosed to become part of a single large apartment comprising what were once separate apartments. (Lilien Rep. Aff. ¶¶ 22–6, Exs. E & F; Fass Aff. Ex. B.)

In most or all of these instances, a single owner apparently holds the shares and proprietary leases to all of the "combined" units, and under normal circumstances the reconfigured entity would likely be treated by the real estate market as a single apartment that would be transferred as a unit. At the same time, in terms of the legal documents governing ownership

rights, the owner of such a combined unit continues to hold separate leases and the separate shares originally associated with each of the formerly separate units, except where the annexation of formerly common property such as a hallway has resulted in an increase in the shares allotted to a unit. (Stip.¶ 10.) According to the Co-op, as a result of these changes there are now only 128 "legal dwelling units" in the building, and there were only 130 in November of 1998, when, according to the Co-op's calculation, the Sponsor's holdings were finally reduced below 25%. (D. Mem. at 3–4.)

So what does the Act mean when it provides that the termination period begins when the developer owns 25% of the "units"? Does it mean the "units" that existed at the time of the conversion and were defined as such in the original conversion plan? Or does it mean the shifting number of "units" that may come to exist over time as apartments are consolidated or divided? And if the latter is intended, then how are we to determine whether a particular set of alterations in the physical and legal landscape affects the definition of a unit? Are we to look, for example, to the physical inter-accessibility of formerly separate units, or to the local zoning regulations that determine whether a particular configuration complies with some municipal definition of a dwelling unit?

The parties take sharply contrasting positions on this question. The Sponsor maintains that the number of "units" in the statutory sense is fixed for all time, essentially at the discretion of the developer, by the number defined in the conversion plan. The Co-op argues that the number of "units" corresponds to the number of separate apartments that may exist at any given time, though it has not been completely clear or consistent about precisely what criteria it believes should be used to determine when a physical consolidation of

apartments effects a change in the number of "units" that exist for purposes of § 3607(b). In arguing their positions, each party parses a variety of statutory materials, pursues a number of policy arguments, and offers predictions of absurd or dangerous results that would follow from adopting its adversary's view.

The language of the Act, however, which is after all the starting point for analysis, see, e.g., United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir.1994), offers some guidance. The term "cooperative unit" is defined in the Act as

a part of the cooperative property which is *subject to exclusive use and possession by a cooperative unit owner.* A unit may be improvements, land, or land and improvements together, *as specified in the cooperative documents.*

15 U.S.C. § 3603(12) (emphasis added). The Co-op argues that under this definition, when apartments are combined, the resulting entity is "subject to the exclusive use and possession" of a single owner and is therefore a single unit. (D. Mem. at 20.) But this interpretation misses the point of the quoted phrase. The primary purpose of the language relied on by the Co-op appears to be to distinguish the "units"— separate, privately occupied portions of the building subject to "exclusive use and possession" of an individual "owner"—from the areas of the building subject to common use, and not to distinguish one "unit" from another.

The more significant portion of the definition for our purposes is its second sentence, which indicates that a "cooperative unit" may consist of whatever portions of the building are so designated "in the cooperative documents." The reference to such documents as the determinant of individual units is bolstered by the definition of "cooperative unit owner," a term directly incorporated into the definition of a "cooperative unit." A "cooperative unit owner" means

the person having a membership or share interest in the cooperative association and *holding a lease, or other muniment of title or possession, of a cooperative unit that is granted by the cooperative association as the owner of the cooperative property.*

§ 3603(13) (emphasis added). These provisions, taken together, appear to indicate that to determine the number of units in a cooperative, one should look to the "cooperative documents," and in particular to the "lease[s]" or other documents that assign possession of portions of the cooperative to individual owners.

The Sponsor, as indicated above, argues that the number of "units" is determined for all time by a single "cooperative document," the offering plan that defines the cooperative as consisting of 137 units. But for purposes of this case, there is no need to decide whether the term "documents" should be given such a narrow meaning. For it is undisputed that essentially *all* the documents that could reasonably be looked to in determining the number of units point in the same direction.

In particular, when apartments were combined, however the resulting combination was defined or described for purposes of local building or zoning regulations, legally the owners of the combined units continued to hold separate proprietary leases, along with their associated shares in the corporation, for each "unit" consolidated into the larger apartment. (*See* Pl. Mem. at 8; Stip. ¶ 10.) As a legal matter, it appears undisputed that the owner thus held two separate assets, which could in principle be dealt with (for example, refinanced) separately. Nothing in the "cooperative documents" suggests that the number of "units" ever changed simply because one person owned two adjoining apart-

ments.[7] Just as one owner (for example, the Sponsor) could own multiple separate units within the building, without extinguishing their existence as separate units, so could a single owner acquire two contiguous units, and (with the appropriate approval of the Co-op board) consolidate those units physically into a single living space, without extinguishing their existence as separate units.[8]

The Co-op's various arguments against this interpretation are unpersuasive. First, its arguments arising from the statutory text try to infer meaning from provisions of the statute tangential to § 3607(b). For example, the Co-op attempts to draw support from the definition of "conversion project" in § 3603(7). (D. Mem. at 18–9.) That section provides:

> "[C]onversion project" means a project, which has five or more residential units, which was used primarily for residential rental purposes immediately prior to be-

ing converted to a condominium or cooperative project.

Because this definition used the present tense in its first relative clause, and the past in the second, the Co-op argues that the number of units in a cooperative for purposes of § 3607(b) should be determined as of the time of the calculation, not as of the time the cooperative is formed. But this is illogical for several reasons. The definition in question is not addressed to the calculation made in § 3607(b), but to whether a cooperative is covered by the Act at all a project with fewer than five units is not within the protection of the Act. See 15 U.S.C. § 3607(a)(1). Even in that context, moreover, it would be perverse to attribute to the definition the significance the Co-op would attach, for doing so would mean that a cooperative containing five units at the time of conversion, and thus large enough to fall within the protection of the Act, would lose the protections of the § 3607(b) altogether if a

7. The Co-op asserts that it had "intended" to revise these documents. (Stip.¶ 10.) But such an unexecuted intention, assuming it existed, is irrelevant. The statute refers to "the cooperative documents," not to hypothetical documents that the Co-op might have created but did not.

8. Because the documents in this case are consistent, there is no need to determine what documents would control if there were inconsistencies, or whether the Co-op would have had the power to alter the number of statutory "units" by resolutions that altered the assignment of shares or the nature of the leases held when apartments were combined. It should be noted, however, that, contrary to the Sponsor's position, there seems to be nothing absurd or contrary to the regulatory scheme about the possibility that the number of units might change over time. The statute clearly contemplates that the percentage of units owned by the developer will have to be calculated on an ongoing basis. The numerator of that fraction will change as the Sponsor sells apartments, and no additional difficulty is presented by the possibility that the denominator also could change. While the Co-op's

various suggested approaches (determining when consolidated apartments count as a single unit by reference to physical criteria, or residential usage, or the vagaries of definition in local zoning or building codes) present undesirable fact-finding difficulties that could become complex and unpredictable, reference to the treatment of units in leases directs attention to a uniform and simple standard. Nor would it follow, as the Sponsor suggests, that the window for terminating self-dealing leases could open and close multiple times. The Act provides that the window opens when the developer owns 25% or less of the units, and remains open for two years. § 3607(b). There is no provision for closing the window if the developer reacquires an apartment or otherwise increases its share above 25% after that point. Nor would the number of units be subject to "manipulation" by the Co-op: apartment owners' interest in combining or subdividing apartments will arise for substantial reasons independent of any desire of the Co-op to manipulate the number of units affecting the window period.

unit owner combined two apartments a few years later. Finally, the interpretation adopted by the Court is not inconsistent with the argument that the denominator number of units should be determined as of the time of the calculation, so long as the determination is made according to the cooperative documents, and not according to a shifting standard based on physical inspection or the interpretation of local ordinances.

■ Second, the Co-op suggests that the Sponsor's preferred calculation will defeat the purposes of the Act, by allowing the window to open at a time when the developer can continue to exercise control, because apartment consolidation will have reduced the number of independent owners able to resist the developer's wishes and vote to terminate a self-dealing contract. (*Id.* at 24) But this argument is flawed. Under § 3607(c), termination of a contract "shall be by a vote of owners of not less than two-thirds of the units other than the units owned by the developer [and its affiliates]." Contrary to the Co-op's interpretation (D. Mem. at 17), this does not mean that the vote is "on a 'one owner one vote' basis." The Act requires a super-majority of two-thirds of the *units,* not of two-thirds of the *owners.* Thus, the owner of an apartment that has been physically consolidated but that still, according to the cooperative documents, represents two units, would get two votes.[9] In any event, since the termination vote does not take into account the votes of the developer's units, it is hard to understand how the developer's influence is affected by increasing or decreasing the number of owners or units whose votes do count.

Accordingly, under the circumstances presented in this case, the statutory defini-

tion of "cooperative unit" provides a clear-cut result: looking to the "cooperative documents," the base number of units on which the 25% calculation is to be made remains at 137.

## II. *The Numerator: How Many Units Does the Developer Own?*

■ The second issue in the case concerns how many units "the developer owns" within the meaning of § 3607(b)(2). Once again, the Sponsor presents a fairly simple test: by October 16, 1997, it had sold all but 34 units; the only units it owned were the 34 to which it continued to hold title. The Co-op argues, however, that two additional apartments, which were owned by individuals who had some relationship with the Sponsor, should also be attributable to it. (D. Mem. at 21.) Once again, the Co-op's position proves unpersuasive.

The Co-op's argument is flawed at its very root. Its fundamental premise—indeed, the very first sentence of its argument—states that "[t]he '25 per centum' trigger of § 3607(b)(2) refers to ownership not by the Sponsor alone but by all 'developers'" (D. Mem. at 20.) But this is flatly inaccurate. The Act provides, as we have seen already, that the termination period opens when "the *developer*"—singular— "owns 25 per centum or less of the units." Nothing in § 3607(b) suggests that a cooperative or condominium project could have multiple "developers"—the original Sponsor and other people who later purchase apartments from it. In ordinary English, it would appear straightforward that the Sponsor here acted as the developer in this project. The Sponsor owned the building before the conversion, submitted the offer-

9. Indeed, this is how the Co-op actually counted the votes on the proposal to termi-

nate the garage lease. (Stip.¶ 13.)

ing plan to convert the building to cooperative ownership, and managed the process of selling cooperative units to the existing tenants or to outside purchasers.

It is equally straightforward that the Sponsor does not "own" the two units in question. One of these units was purchased from the Sponsor in 1988 by a married couple, one member of which worked for a law firm, Kenneth B. Newman, P.C., whose principal is and has been the liquidating partner of the Sponsor. (Stip.¶ 11.) Despite this (somewhat tangential) connection to the Sponsor, the Co-op does not contend that the purchase (which occurred long before anyone contends the termination window opened) was a sham, or that the owners are nominees for the Sponsor. The other questioned unit was sold in 1985, apparently at the time of the conversion, to a woman who worked for a different law firm, whose only connection to the Sponsor is that it rents space to the Newman firm. (*Id.* ¶ 12.) The unit was conveyed in 1989 to the original owner and her husband as tenants in common. (*Id.*) Again, there is no contention that the sale was other than a *bona fide* transaction.

The Co-op contends, nevertheless, that the two couples owning these apartments should be treated as "developers" equally with the Sponsor. The contention is strained. "Developer" is defined by the Act to mean

(A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert or withdraw real estate from the cooperative or condominium project, and

maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association.

§ 3603(14) The owners of the questioned apartments clearly are not covered by clause (A): unlike the Sponsor, they were not and could not be in the business of selling units "not previously conveyed," since the units they own *were* previously conveyed, from the Sponsor as original developer to them. Nor, on any ordinary reading, are they covered by clause (B): they would not appear to be "successors" to the Sponsor in any recognized sense of the word; they are not offering to sell units in the project; and the Co-op does not contend that they, as ordinary owners of apartments, have any of the attributes of "special developer control" listed in the clause.

Controlling case law dictates the conclusion that the owners of the two units are not "successors" to the Sponsor within the meaning of the statute. In *Darnet Realty Associates LLC v. 136 East 56th Street Owners, Inc.*, 214 F.3d 79 (2d Cir.2000), a cooperative argued that a corporation that had purchased the original developer's remaining shares in the cooperative (and a second corporation that had then purchased the shares of the first) should be treated as "successors" within the meaning of § 3603(14)(B). *Id.* at 84–85. Notably, in *Darnet* the contention had more surface plausibility than the Co-op's argument here, since the corporations in question apparently succeeded to all of the ownership interest in the cooperative's units formerly held by the original developer, and thus held a stake and played a role in the cooperative analogous to that of the developer, whereas in this case the alleged "successors" are simply purchasers of individu-

al units. Nevertheless, the Second Circuit rejected the claim that the corporations were "successors," adopting "the reasons given by the district court":

> [I]n the instant legal context, the reasonable reading of "successor" encompasses a party who not merely succeeds the original developer in time, but who also can be expected to succeed the original developer in interest pertaining to the self-dealing contract at issue. . . .

> [W]here a party can neither be said to be controlled by the original developer or be the original developer's alter ego, nor be expected for any other reason to share the original developer's interest in the self-dealing lease, the purpose of the statute is not furthered by a continued tolling of the two year window.

*136 East 56th Street Owneres, Inc. v. Darnet Realty Associates*, 1999 WL 47328 at *6 (S.D.N.Y. Feb.1, 1999) (as quoted in *Darnet*, 214 F.3d at 85). The Court then concluded that, since the original developer did not have an interest in the corpora-

tions in question, which in turn did not have any interest in the self-dealing lease, the corporations were not "successors" of the developer.[10] *Darnet*, 214 F.3d at 85.

■ Here, as in *Darnet*, there is no indication that the owners of the two units are alter egos of the Sponsor, or are controlled by it. Nor is it contended that the owners have any stake or interest in the garage lease. The Co-op's speculative argument that the owners may have friendly or business relationships with a principal of the Sponsor is not the sort of "interest" in the self-dealing contract to which the *Darnet* courts referred: a generally favorable disposition toward another party, or an inclination to accommodate such a party, does not make one a "successor" to that party's interests.[11]

Finally, even if the owners in question were "successors," the Co-op's efforts to show that they had incidents of "special developer control" rest on strained analysis of the fact that they were holders of "Unsold Shares," meaning that they

---

**10.** Judge Sand's opinion in the district court provides further enlightenment, by contrasting the situation in *Darnet* with the case of a true successor:

> As often occurs, an original developer can transfer its shares and powers to another entity that has the same interests as the original developer in terms of the self-dealing lease. For example, in the instant case, the original developer, Darnet Realty Associates, restructured itself into Darnet Realty Associates, LLC. Under such circumstances, the continued tolling of the two year window serves the goal of the Act because the new entity can be expected to attempt to prevent such termination.

1999 WL 47328 at *6. The facts of this case could not be farther from the cited example of a true "successor."

**11.** The Co-op's fears that, unless the owners here are treated as "successors," it would be "far too easy for Sponsor's [*sic*] to avoid their obligations under the Abuse Relief Act by assigning units to friendly holders of Unsold Shares who will support the Sponsor's con-

trol and vote against termination of any self-dealing lease" (D. Mem. at 24) have no application to this case. There is no indication in this record that the Sponsor simply "assigned" shares to nominees to perpetuate its control; the Co-op does not contend that the owners of these units were anything other than *bona fide* purchasers for value. No reasonable fact finder could infer that the Sponsor sold these units, early in the conversion process, in order to manipulate the opening of the termination window a decade later. If a developer *did* try to manipulate the process by sham transfers to nominees, quite a different situation would be presented. Nor is it relevant that the owners of these units voted against terminating the lease. The owners were neither required to accept the Co-op's view that these votes were "against their own economic interests" (D.Mem.24), nor prohibited from voting for non-economic reasons. The critical point is that they had no economic stake in maintaining the challenged lease.

"hold[ ] their units for investment, rather than occupancy." (D. Mem. at 4.) This apparently gives these owners certain privileges, in common with the Sponsor, such as "to sublet or assign their units without the permission of the Cooperative's Board of Directors, and are exempt from the payment of sublet or assignment fees." (*Id.*) But the Act makes clear what incidents of "special developer control" make a "successor" into a "developer"— the kind of features associated with a "developer" or Sponsor in the ordinary understanding, such as adding or withdrawing real estate from the cooperative, maintaining a sales office, and exercising easements to make improvements in the cooperative. *See* 15 U.S.C. § 3603(14). The individual unit owners in question clearly did not play such a role.[12]

### Conclusion

Sometimes, things are just what they seem. According to the controlling documents, the cooperative at 350 Bleecker Street has 137 cooperative units, even if a few pairs of those units are owned by the same person and are physically connected. The Sponsor is the "developer" of this cooperative project, and by October 16, 1997 it had sold all but 34 of the units, and therefore owned less than 25% of the units. Accordingly, to terminate the garage lease held by the Sponsor's affiliate, the Co-op had to act within two years of that date. As it did not, the attempted termination in 2000 was ineffective.

Plaintiff's motion for summary judgment is therefore granted, and defendant's cross-motion is denied. Judgment will be entered for the plaintiff on its claims, and for plaintiff and additional counterclaim defendant on defendant's counterclaim.

SO ORDERED.

---

**12.** *305 East 40th Garage Corp. v. 305 East 40th Owners Corp.*, 833 F.Supp. 991 (S.D.N.Y. 1993), on which the Co-op relies, is not to the contrary. That case dealt with holders of unsold shares who "are just conduits for the resale of units," "who own for the sole purpose of selling," rather than "long-term individual owner[s]." *Id.* at 995. The Co-op has made no effort to establish that these characterizations fit the owners here, who had owned the units in question for ten to fifteen years at the time of the attempted termination of the garage lease.