BLEECKER CHARLES CO., Plaintiff–Counter–Defendant–Appellee,

Bleecker Parking Corp., Counter–Defendant–Appellee,

v.

350 BLEECKER STREET APARTMENT CORPORATION, Defendant–Counter–Claimant–Appellant.

Docket No. 01–9291.

United States Court of Appeals, Second Circuit.

Argued: Aug. 6, 2002.

Decided: April 23, 2003.

Robert N. Fass, Friedman, Krauss & Zlotolow, New York, NY, for Defendant–Counter–Claimant–Appellant.

Dale A. Schreiber, Proskauer Rose, LLP, New York, NY, for Plaintiff–Counter–Defendant–Appellee.

Before: LEVAL, CALABRESI, and POOLER, POOLER, Circuit Judges.

POOLER, Circuit Judge.

The district court granted declaratory judgment in favor of the plaintiff, Bleecker Charles Co., the developer of an apartment cooperative, ruling that the defendant, 350 Bleecker Street Apartment Corp., the cooperative was untimely in terminating a long-term lease of a parking garage to the plaintiff. The developer had caused the cooperative to enter into a lease at a time when the developer was in complete control of the cooperative and thus capable of unimpeded self-dealing. The cooperative appeals, asking us to rule that its termination of the lease was timely.

In enacting the Condominium and Cooperative Conversion Protection and Abuse Relief Act, 15 U.S.C. §§ 3601–16 (the "Act"), Congress recognized that "certain long-term leasing arrangements for recreation and other condominium— or cooperative-related facilities which have been used in the formation of cooperative and condominium projects may be unconscionable." 15 U.S.C. § 3601(a)(3). Because a cooperative sponsor or developer typically exercises almost total control over the affairs of a cooperative in its early days, prior to the developer's sale of cooperative units, the developer may cause the cooperative to enter into a disadvantageous long-term lease with the developer itself or with an affiliated entity.

To curtail such abuses, the Act allows a cooperative to terminate certain self-dealing contracts, 15 U.S.C. § 3607, without proof of unconscionability or one-sidedness, *181 E. 73rd St. Co. v. 181 E. 73rd Tenants Corp.,* 954 F.2d 45, 48 (2d Cir. 1992). To be terminable, the contract must first "provide[ ] for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project." 15 U.S.C. § 3607(a)(1). Second, the contract must be between the unit owners or association "and the developer or an affiliate of the developer." 15 U.S.C. § 3607(a)(2). Third, the association must have entered into the contract while the developer still had "special developer control" or "because the developer held a majority of votes in [the] association." 15 U.S.C. § 3607(a)(3). Finally, the contract must extend for more than three years. 15 U.S.C. § 3607(a)(4).

To terminate a qualifying contract, the owners of two-thirds of the units other than those owned by the developer or its affiliates must vote for termination. 15 U.S.C. § 3607(c). The unit owners must act within a two-year period that begins on the earlier of the dates "on which—(1) special developer control over the association is terminated; or (2) the developer owns 25 per centum or less of the units in the conversion project." 15 U.S.C. § 3607(b).

This appeal turns on the interpretation of Section 3607(b)'s limitations period and, more specifically, on both the denominator—number of units in the project—and numerator—number of units owned by the developer—used to determine when a developer owns 25% or less of the units in

the conversion project.[1] Plaintiff Bleecker Charles Company ("Sponsor" or "Developer") contends that the number of units in a condominium or cooperative project is determined for all time when the project is created. Defendant 350 Bleecker Street Apartment Corporation ("Cooperative") argues that the number of units changes over time as units are subdivided or combined. The Cooperative also maintains that two units owned by acquaintances or associates of the Developer's sole principal should have been attributed to the Developer. If the Cooperative is correct either that the number of units constituting the denominator changes as units are subdivided or combined, or that both of the apartments owned by persons associated with the Developer should be attributed to the Developer, its July 19, 2000, notice terminating a lease between the Cooperative and the Sponsor was timely. We hold that the number of cooperative units was fixed when the cooperative was created. Because we also find that at least one of the two couples that the Cooperative seeks to count as a developer is not a developer, we affirm.

## BACKGROUND

### I. The offering plan and closing

In December 1984, the Sponsor filed an offering plan for the building and land located at 350 Bleecker Street in Manhattan. The plan, as amended, called for the Sponsor to transfer fee simple interest in the 350 Bleecker Street property to the Cooperative, which would simultaneously issue proprietary leases and related shares for 137 residential units to the Sponsor.

Prior to closing, entities other than the Sponsor contracted to purchase thirty-one of the units. Therefore, at the July 31, 1985, closing, the Sponsor conveyed its fee simple interest in the property to the Cooperative, and the Cooperative issued thirty-one leases and related shares to the new unit owners as well as 106 leases and related shares to the Sponsor for the units it continued to own.[2] At the same closing, the Cooperative, as landlord, and the Sponsor, as tenant, entered into a seventy-five year lease for "two ground floor commercial spaces and the basement parking garage" at 350 Bleecker Street (the "garage lease").

### II. Purchases by individuals with ties to the Sponsor

Also on July 31, 1985, Kathleen Gianetti bought the lease and related shares for one unit from the Sponsor. At the time of closing and until November 1, 1999, Gianetti worked for Blumenthal & Lynne, PC, the Sponsor's counsel and the landlord for the Sponsor's principal's law firm, Kenneth B. Newman, P.C. In 1989, Giannetti's lease and shares were transferred to her and to her husband, Anatole Iwanczuk, as tenants in common.

In 1988, Shirley and Anthony Lomanto purchased the lease and related shares for another unit from the Sponsor. Mrs. Lomanto worked then and still works for Kenneth B. Newman, P.C.

### III. Combined units

Article 5 § 4 of the Cooperative's bylaws authorizes it to grant a request by the "owner or owners of one or more proprietary leases covering one or more apart-

---

1. Neither party claims that the Sponsor's special developer control over the project has ended.

2. We refer to unit owner because this is the common usage. However, in fact, the unit "owners" occupy their units pursuant to long-term leases and own shares in the project as a whole. The cooperative owns the project.

ments in the apartment building and of the shares issued to accompany the same" to subdivide an existing apartment or combine all or portions of one or more existing apartments. The board must then reallocate shares to reflect the new alignment, but "the total number of the shares so reallocated [must] remain[ ] the same."

Between the closing and June 27, 2000, the date on which the cooperative's members voted to terminate the garage lease, several persons purchased multiple units and received permission to combine them. The Cooperative claims that sixteen original apartments had been combined into seven existing apartments by the time of the termination vote. Except where a hallway space was added to existing apartments, combinations did not result in any change in stock ownership. That is, the owner of a three-apartment combined unit continued to own the stock originally issued for each of the apartments. The board did not issue new leases for combined apartments.

## IV. Sponsor's percentage of ownership

Both parties agree that the Sponsor now owns less than 25% of the units on the property. However, the date on which the Sponsor's ownership percentage dropped below 25%—and consequently the timeliness of the Cooperative's July 19, 2000, attempt to terminate the lease—depends on the choice of a numerator and denominator. Using the 137 units described in the offering plan as a denominator and attributing neither the Iwanczuk nor the Lomanto unit to the Sponsor in the numerator, the Sponsor first owned 25% or less of the units in the cooperative on October 16, 1997. However, if the number of combined units rather than the number of original units is the proper denominator, the Cooperative claims that the Sponsor's ownership percentage did not drop to 25%

until November 5, 1998, when the Sponsor owned thirty of 130 existing units. If both the Iwanczuk and Lomanto units are added to the numerator attributable to the Sponsor but the number of units existing at the time the cooperative was created is the proper denominator, the Sponsor's ownership percentage also first dipped below 25% on November 5, 1998. Other permutations are possible, but these examples demonstrate the importance of determining the correct denominator and numerator.

## V. The termination vote

On June 27, 2000, the Cooperative's board held a meeting of shareholder/tenants to consider termination of the garage lease. With the exception of the Sponsor, the board allowed the owners of all units designated in the original plan to vote. After the vote, the presiding officer announced that "the resolution had passed 87 to zero with 20 abstentions [including the Lomantos and Iwanczuks], based upon one vote for each Sponsor's Unit sold by the Sponsor from July 31, 1985 until the date of the meeting."

On July 19, 2000, the Cooperative sent the Sponsor a notice of termination.

## VI. Proceedings in the district court

On October 13, 2000, the Sponsor filed a lawsuit in which it sought a declaration that the termination letter was ineffective and an order enjoining the Cooperative from interfering with the rights of the Sponsor and those of its subtenant, Bleecker Parking Garage Corporation, in the garage lease. The Cooperative answered and counterclaimed for a judgment declaring the termination effective. After closure of the pleadings, the parties filed cross-motions for summary judgment. The Sponsor and subtenant contended that the cooperative did not terminate the lease

within the two-year window provided by Section 3607(b). In response, the Cooperative argued, as it does here, that the two-year window did not open until November 5, 1998, at the earliest.

The district court granted summary judgment to the Sponsor. *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 181 F.Supp.2d 257 (S.D.N.Y.2001). In determining the number of cooperative units, the court began with 15 U.S.C. § 3603(12), which defines "cooperative unit" as "a part of the cooperative property which is subject to exclusive use and possession by a cooperative unit owner. A unit may be improvements, land, or land and improvements together, as specified in the cooperative documents." *Id.* at 262 (emphasis omitted). Based on Section 3603(12)'s reference to cooperative documents, the court found it must look to these documents to determine the number of units in the project. *Id.* Because Section 3603(12) further defines a cooperative unit as the part of the property "subject to exclusive use and possession of a cooperative unit owner," the court also looked to Section 3603(13), which defines a "cooperative unit owner" as

> the person having a membership or share interest in the cooperative association and holding a lease, or other muniment of title or possession, of a cooperative unit that is granted by the cooperative association as the owner of the cooperative property.

The court concluded from this language that leases and shares were the key to determining how many units exist. *Id.*

Because neither the number of shares nor the number of leases decreased between the creation of the project and the termination, the district court found that it was not necessary to decide whether the total number of units should be determined as of creation of the project or on an ongoing basis. *Id.* at 263 n. 8. Because leases and shares for 137 units existed at all times, the court held that the total number of units, or denominator, is 137. *Id.*

The district court next turned to the number of units attributable to the developer—the numerator in the fraction used to determine the sponsor's percentage of ownership. It rejected the Cooperative's contention that the Iwanczuks and Lomantos were developers, which would require their apartments to be counted toward the Sponsor's total. The court first found that because Section 3607(b)(2) uses the singular of "developer," it contemplates only one relevant developer. *Id.* at 264. The court also construed 15 U.S.C. § 3603(14), which defines developer to mean:

> (A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association.

Because the Sponsor conveyed the Lomantos' and Iwanczuks' units to them, the court found it self evident that these units did not fall within clause (A). *Id.* at 265. The court rejected Clause (B)'s applicability because neither couple functioned as an alter ego of the Sponsor or had any stake in the garage lease. *Id.* at 265–66. In the alternative, the court found that even if the Iwanczuks or Lomantos were "successors"

within the meaning of Clause (B), they did not exercise "special developer control" within the meaning of the statute. *Id.* at 266–67.

The Cooperative filed a timely appeal and now contends principally that the district court erred by (1) relying solely on the leases and shares to set the denominator number while ignoring other documents such as board minutes that demonstrate that units were combined; (2) holding that there could be only one developer of a condominium or cooperative project; and (3) finding that the Iwanczuks and Lomantos were not developers. In addition to defending the district court's rationale, the Sponsor urges that the correct point for determining the denominator is the date of creation of the project.[3]

## DISCUSSION

### I. Standard of review

We review de novo the district court's grant of summary judgment. *E.g., Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 285 (2d Cir.2002).

### II. Finding the denominator

As previously indicated, the termination window opened in this case when "the developer own[ed] 25 per centum or less of the units in the conversion project." 15 U.S.C. § 3607(b)(2). The Sponsor urges that the number of units in the conversion project—the denominator—must be determined when the project is created while the Cooperative contends that the denominator changes over time depending on combinations and subdivisions of units.

 To determine the meaning of a statute, "we look first to the language of

the statute itself." *Marvel Characters,* 310 F.3d at 290. If those words are unambiguous, the process goes no further. *Id.* In the event of ambiguity, "we may seek guidance in the legislative history and purpose of the statute." *Id.* Our interpretation "must ... comport[ ] with [the statute's] primary purpose and ... not lead to anomalous or unreasonable results." *Id.* (internal quotation marks omitted).

Neither party's attempt to identify unequivocal guidance in the words of the Act itself persuades us. Based on Section 3607(b)(2) and a definitional section of the Act, 15 U.S.C. § 3603(12), the Cooperative maintains that Congress provided that the number of units to be used as the denominator for a Section 3607 equation could change over time. It relies first on the use of the present tense in the clause "the developer owns 25 per centum or less of the units in the conversion project." 15 U.S.C. § 3607(b)(2). This argument fails to persuade because "owns," the present tense verb, refers to the developer's ownership of units, which is expected to fluctuate, and not to the number of units in the project.

The Cooperative also relies on two aspects of Section 3603(12): its temporal element and a portion of its definition. That section defines "cooperative unit" as

> a part of the cooperative property which is subject to exclusive use and possession by a cooperative unit owner. A unit may be improvements, land, or land and improvements together, as specified in the cooperative documents.

Because the definition rests on exclusive use and possession and uses the present tense, the Cooperative contends that units must be recounted every time there is a

---

**3.** The Sponsor also defends the judgment on alternative grounds raised below but not addressed by the district court. We have no need to reach or address these alternative grounds.

subdivision or combination. We do not agree. As the district court pointed out,

> [t]he primary purpose of the language relied on by the [Cooperative] appears to be to distinguish the "units"—separate, privately occupied portions of the building subject to "exclusive use and possession" of an individual "owner"—from the areas of the building subject to common use, and not to distinguish one "unit" from another.

*Bleecker Charles,* 181 F.Supp.2d at 262. In addition, nothing in the definition suggests that Congress intended it to define the moment at which the number of units would be calculated for purposes of Section 3607(b)(2).

The Sponsor emphasizes different portions of the Act. Relying on Section 3607(b)(2)'s reference to "units in the conversion project," and Section 3603(7)'s definition of "conversion project" as "a project which has five or more residential units, which was used primarily for residential rental purposes immediately prior to being converted to a condominium or cooperative project," the Sponsor argues that the Act focuses on the moment of conversion as the time of definition. This argument has some merit. Section 3607(b)(2)'s focus on the conversion project suggests that the denominator is set on the date of conversion. However, the two sections do not, on their own, bear the weight the Sponsor seeks for them. The principal importance of the Act's definition of "conversion project" is that cooperative and condominium projects that did not formerly house tenants are not covered by the Act. *See, e.g.,* 15 U.S.C. § 3607(a)(1) (indicating that only contracts involving a conversion project or property serving a conversion project can be terminated). Thus, although Section 3607(b)(2) suggests that the denominator is the number of units existing at the time of conversion, it is not an unequivocal indicator of Congressional intent.

Because the language of Section 3607(b)(2) does not clearly convey its framers' intent concerning the date (or dates) on which units must be counted, we resort to other aids to interpretation. Neither party identifies any pertinent legislative history. However, the statute itself articulates its purposes. They are

> to minimize the adverse impacts of condominium and cooperative conversions particularly on the housing opportunities of low— and moderate-income and elderly and handicapped persons, to assure fair and equitable principles are followed in the establishment of condominium and cooperative opportunities, and to provide appropriate relief where long-term leases of recreation and other cooperative- and condominium-related facilities are determined to be unconscionable.

15 U.S.C. § 3601(b).

The first listed purpose has no apparent relevance to the issues before us. However, the goals of "assur[ing] fair and equitable principles" and "provid[ing] appropriate relief" with respect to long term contracts both are best served by a transparent process in which neither party is encouraged to manipulate the division or combination of units. Using the number of units provided in the documents establishing the conversion project means that both the sponsor and the cooperative members know the denominator from the moment the cooperative is established. The Cooperative's approach requires cooperative members to consult many documents and not just one to determine how many units are in the project. This difficulty is exacerbated when, as here, the Sponsor, can combine and divide apartments without permission from the board. We believe that the Cooperative's ap-

proach creates an unacceptable danger that the window for terminating a lease will close before most cooperative members are aware it has opened.

In addition, the Cooperative's method gives both sponsors and cooperative board members an incentive to manipulate the date on which the window will open by creating, approving, or disapproving unit combinations and divisions. Their decisions on these issues often will either delay or accelerate the date on which the window opens.

The Cooperative argues, however, that fixing the units at the time of conversion underestimates the Sponsor's continuing control over the project and therefore undermines the statutory goals. If this argument were valid, it might outweigh the need to ensure transparency and to discourage manipulation. It is not valid. In the Cooperative's view, the owner of three combined units somehow has less motivation or ability to contest a disadvantageous lease than she did before she combined them. The logic of this position is not apparent. The owner of the combined units continues to own the same amount of space and the same number of shares, giving her the same stake in the long-term contract. Moreover, as long as all units in the original plan continue to be counted as units for purposes of Section 3607(b), the owner of three combined units has the same voting power as the owner of three individual units. *See* 15 U.S.C. § 3607(c). Indeed, the Cooperative counted "[e]ach Unit designated under the Original Plan" when it attempted to terminate the garage lease.

█ Because using the number of units set out in the conversion plan as the denominator best serves the policy goals of the Act and is consistent with the statutory language, we hold that, for the purposes of calculating under Section 3607(b)(2), the percentage of units owned by the developer, the total number of units in the conversion project is the total number of units at the time of conversion.

### III. The numerator

█ The Cooperative argues that the Lomantos and Iwanczuks are "developers" within the meaning of Section 3607(b), requiring that their units be aggregated with those of the Sponsor in order to determine the first moment at which the Sponsor held 25% or less of the total units. If the numerator is so calculated, the termination window did not open before November 5, 1988, and the July 19, 2000, termination letter was timely. As we previously noted, Section 3603(14) defines developer as

(A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association.

Because the Iwanczuks' and Lomantos' units were conveyed to them by the Sponsor, the two couples do not fall within clause (A). We must consider, however, whether they are successors to the Sponsor under clause (B).

█ Being a "successor" within the meaning of the statute requires more than simply "succeed[ing] the original developer in time." *Darnet Realty Assocs., LLC, v.*

*136 E. 56th St. Owners, Inc.*, 214 F.3d 79, 85 (2d Cir.2000) (quoting *136 E. 56th St. Owners, Inc., v. Darnet Realty Assocs. LLC*, 1999 WL 47328, at *6 (S.D.N.Y. Feb.1, 1999)). In addition to temporal succession, the putative successor must either "be the original developer's alter ego [or] be expected for any other reason to share the original developer's interest in the self-dealing lease." *Id.*

Neither the Iwanczuks nor the Lomantos have an interest in the lease that differs from the interest of other shareholders. If terminating the lease would benefit the other shareholders economically, it also would benefit the Iwanczuks and Lomantos. Thus, the two couples do not have an economic interest that is allied with the Sponsor's. Nevertheless, the cooperative contends that the district court should have found a sufficient affinity of interest based on a combination of several factors. First, the Sponsor produced both couples, designated them as holders of unsold shares, and guaranteed their obligations. Second, neither couple voted in favor of termination. Third, Mrs. Lomanto's livelihood was dependent on the good will of the sponsor's principal and Mrs. Iwanczuk's livelihood was dependent on the good will of the sponsor's attorney and landlord.

We do not find a sufficient identity of interest between the Iwanczuks and the Sponsor. Mrs. Iwanczuk's status as a former employee of the Sponsor's former attorney, who also is the landlord of the Sponsor's liquidating partner is too attenuated, as a matter of law, to count the Iwanczuks as developers. *See Darnet*, 214 F.3d at 85 (holding that where neither alter ego status nor shared interest exists, statutory policy does not support continued tolling).

Because the cooperative concedes that if the number of units is set at the time the cooperative is created, it must establish that both the Iwanczuks and Lomantos are developers, we need not address the more difficult issue of the Lomantos' status. *See* Appellants Brief at 49–50. The sponsor owned less than 25% of the units in the project as of October 16, 1997, and the cooperative's July 19, 2000, notice was untimely.

## CONCLUSION

For the reasons we have discussed, we affirm the judgment of the district court.